DAVID J. CONNOLLY et al., as Receivers to Collect a Judgment in Favor of Burlington County Bridge Commission, et al., Respondents, *v.* ROBERT K. BELL et al., Defendants, and THEODORE R. HANFF et al., Appellants.

Argued November 14, 1955; decided February 17, 1956.

*Frederick W. R. Pride, Donald J. Nugent* and *Robert M. Lane* for appellants. I. Either triable issues are presented as to the scope and extent of appellants' defenses or the allegations concerning them must be accepted as true. (*Di Menna & Sons* v. *City of New York,* 301 N. Y. 118; *Werfel* v. *Zivnostenska Banka,* 287 N. Y. 91; *Curry* v. *Mackenzie,* 239 N. Y. 267; *Gravenhorst* v. *Zimmerman & Forshay,* 236 N. Y. 22; *General Investment Co.* v. *Interborough R. T. Co.,* 235 N. Y. 133.) II. Appellants' affirmative defenses are sufficient as a matter of law. (*Munday* v. *Vail,* 34 N. J. L. 418; *Reynolds* v. *Stockton,* 43 N. J. Eq. 211, 140 U. S. 254; *Perkins* v. *Guaranty Trust Co.,* 274 N. Y. 250, 276 N. Y. 553; *Clapp* v. *McCabe,* 155 N. Y. 525; *Walrath* v. *Hanover Fire Ins. Co.,* 216 N. Y. 220; *Lamphere* v. *Lang,* 213 N. Y. 585; *Wright* v. *Delafield,* 25 N. Y. 266; *McNeil* v. *Cobb,* 186 App. Div. 177, 230 N. Y. 536; *International Photo Recording Machines* v. *Microstat Corp.,* 269 App. Div. 485; *McCarthy* v. *Troberg,* 275 App. Div. 139.) III. The judgment here sued upon, by its terms, does not pur-

port to impose liability against the appellant partnership of Ketcham & Nongard for the damages sought by respondents in this action.

*A. Donald MacKinnon, Rebecca M. Cutler* and *Michael F. Orr* for respondents. I. There is no triable issue of fact and summary judgment is proper. (*Franklin* v. *Lee,* 233 App. Div. 592, 259 N. Y. 532.) II. The New Jersey judgment was not lacking in due process. (*Valentine* v. *Richardt,* 126 N. Y. 272; *International Photo Recording Machines* v. *Microstat Corp.,* 269 App. Div. 485; *Post* v. *Browne,* 279 App. Div. 922, 304 N. Y. 610; *Hall* v. *Ames,* 190 F. 138; *Standard Oil Co.* v. *Missouri,* 224 U. S. 270; *Milliken* v. *Meyer,* 311 U. S. 457; *Bell Tel. Co.* v. *Utility Comm.,* 309 U. S. 30; *Schenck* v. *State Line Tel. Co.,* 238 N. Y. 308; *Reynolds* v. *Stockton,* 140 U. S. 254; *Oliphant* v. *Burns,* 146 N. Y. 218.)

*William J. McDonald, Jr., Charles S. Bannerman* and *Covington Hardee* for B. J. Van Ingen & Co., Inc., *amicus curiæ,* in support of respondents' position. I. This suit is an action of debt upon a judgment rendered in another State. Under the United States Constitution that judgment is entitled to full faith and credit. Collateral attack upon a foreign judgment on grounds of lack of jurisdiction is precluded when the jurisdictional issue was or could have been determined in the rendering forum. (*Treinies* v. *Sunshine Mining Co.,* 308 U. S. 66; *Thompson* v. *Whitman,* 18 Wall. [U. S.] 457; *Christmas* v. *Russell,* 5 Wall. [U. S.] 290; *Milliken* v. *Meyer,* 311 U. S. 457; *Fauntleroy* v. *Lum,* 210 U. S. 230; *Sherrer* v. *Sherrer,* 334 U. S. 343; *Stoll* v. *Gottlieb,* 305 U. S. 165; *Chicot Co. Dist.* v. *Bank,* 308 U. S. 371.) II. The New Jersey judgment herein sued upon may not be collaterally attacked on jurisdictional grounds. Full faith and credit precludes such an attack since the jurisdictional issue was or could have been determined in New Jersey. (*Driscoll* v. *Burlington-Bristol Bridge Co.,* 8 N. J. 433; *Davis* v. *Cohen & Co.,* 268 U. S. 638; *Central New England Ry. Co.* v. *Boston & A. R. R. Co.,* 279 U. S. 415.)

CONWAY, Ch. J. This is an action upon a judgment of the Supreme Court of New Jersey. The following is a summary of the background of the litigation.

Sometime during 1946 a group of men — the defendants Bell, Christensen, Hanff, Ketcham, Nongard, Parks and Clifford R. Powell (but not the partnership of Ketcham & Nongard as such, and not the individual defendant Murray) — organized themselves as a syndicate to acquire two bridges across the Delaware River: the Burlington-Bristol Bridge and the Tacony-Palmyra Bridge, both of which were then owned by private corporations. In December, 1946, arrangements were made to purchase the stock of the Burlington-Bristol Bridge Company (hereinafter called Bridge Company) for $1,350,000 — financed by placing a $1,000,000 mortgage upon the bridge, and by giving to the sellers notes for $350,000 secured by the Bridge Company stock. In order to remove a potential obstacle to the syndicate's plans, a bill was introduced in the New Jersey Legislature and passed with the aid of Powell — one of the members of the syndicate — which provided, in effect, that if a bridge became the property of a public body then the State of New Jersey would lose a right which it previously had to acquire that bridge by condemnation at a price regulated by statute (see Rev. Stat. of N. J., § 48:5–22). Thereafter, on October 29, 1947, the syndicate members and their nominees took over the Burlington-Bristol Bridge Company and became its sole stockholders. Although the syndicate advanced no cash of its own at the time of this purchase, it was subsequently necessary for the syndicate members to contribute some $50,000 to the Bridge Company for working capital and expenses. The partnership firm of Ketcham & Nongard acquired a one-quarter interest in the stock of the Bridge Company and contributed one quarter of this sum.

In the spring of 1948 Ketcham and Hanff began negotiating for the acquisition of the stock of the Tacony-Palmyra Bridge Company. With the aid of the Sarjem Corporation, an Illinois corporation which dealt in the purchase and sale of bridges and other public utilities, options were acquired for the purchase of 80% of the stock of this bridge company at approximately twice the price at which it was then being sold on the Philadelphia Exchange. The total offer by the Sarjem Corporation for all the stock of the Tacony-Palmyra Bridge Company was $6,487,500. On October 6, 1948, it was agreed that the Bridge

Company (now owned and controlled by the syndicate) would purchase from the Sarjem Corporation all the stock of the Tacony-Palmyra Bridge Company for $6,700,000, plus certain expenses, provided that the entire transaction was completed by October 22, 1948. Thus the total cost to the syndicate of the two bridges was $8,050,000, plus the expenses referred to in connection with the Tacony-Palmyra Bridge and the $50,000 contributed to the Burlington-Bristol Bridge Company by the purchasers.

During this same time in the fall of 1948 certain members of the syndicate made contact with Freeholder Snover, an elected official of Burlington County, and told him that they had a proposition which would benefit that county. He was informed that if the freeholders should establish a bridge commission, the syndicate would be able to sell to that commission the two bridges here involved for $12,000,000, to be financed by the issuance of $12,400,000 in bridge revenue bonds. No other freeholders were informed of this transaction until the night of October 20, 1948, when a meeting of the freeholders was called at the home of Freeholder Snover. Snover explained the syndicate's proposition and submitted to his associates copies of various documents obtained by the syndicate. The freeholders were told that the entire transaction had to be completed within forty-eight hours "as is" or the proposition would be withdrawn. Before that evening meeting was over, the freeholders had agreed to adopt the syndicate's plan and offer in all particulars, even to the selection of bridge commissioners. The following day the newly chosen bridge commissioners-to-be met with members of the syndicate and accepted the entire proposition. There was no independent inquiry or investigation made by the commissioners, no outside advice was sought by them, and no change in the syndicate's proposition was suggested. On the next day, October 22, 1948, the scheduled public meeting of the Burlington County Freeholders was held, and as the first order of business it unanimously adopted, without discussion, a resolution establishing the Burlington County Bridge Commission and appointing as its members the men selected two days previously. Within a short time the plan for the acquisition of the two bridges was effected. In the words

of the New Jersey Supreme Court, "By 11:30 A.M., less than an hour from the time their meeting had commenced, the bridge commissioners had organized and put through a $12,000,000 transaction of which they were totally ignorant only 18 hours before and about which they had no information or advice other than that furnished them by the sellers." (*Driscoll* v. *Burlington-Bristol Bridge Co.*, 8 N. J. 433, 465). As a result of these transactions, the syndicate realized a net profit of $1,894,637 after payment of $700,000 for promotion fees and expenses, $355,710 for bond discount to the firm of Ketcham & Nongard which was to dispose of the entire issue of bridge revenue bonds, and $100,000 paid in escrow against possible tax liability. After the closing was completed, the firm of B. J. Van Ingen & Co., Inc., organized a syndicate to sell the bonds. A note dated October 27, 1948, in the amount of $11,317,156.40 and signed on behalf of the members of the bond syndicate by B. J. Van Ingen & Co., Inc., and by Ketcham & Nongard as a partnership obligation, was accepted by the Chemical Bank and Trust Company of New York, which made a loan in that amount to the bond syndicate, with the entire issue of bonds pledged with that bank as security, and cancelled certain obligations of Ketcham & Nongard and B. J. Van Ingen & Co., Inc., arising out of loans previously made to facilitate the purchase of the entire bond issue.

On December 3, 1948, the Governor and Attorney-General of the State of New Jersey commenced an action in that State which resulted in the judgment now sued upon in New York and culminated in the present appeal. The original complaint filed in New Jersey alleged the facts substantially set forth above and sought relief in the form of (1) a declaration voiding the resolutions creating the bridge commission, (2) a declaration that all the acts and resolutions of the bridge commission were null and void, (3) a declaration that the deeds transferring the two bridges were null and void, and (4) an order directing that the two bridges be returned to the two companies, respectively, from which the syndicate had purchased them, and "such other and further relief as this Court may deem just and equitable in the premises."

On February 6, 1950, the plaintiffs filed an amended complaint which alleged, *inter alia,* that as a result of the trans-

actions complained of the State of New Jersey had been deprived of its right to acquire the two bridges for some $5,000,000 via condemnation proceedings. Accordingly, the plaintiffs prayed for the difference between that condemnation price and the price paid for the two bridges — $7,400,000. That cause of action was dismissed by the trial court, and no appeal was taken from that dismissal.

The Superior Court of New Jersey determined that the bridge commission should (1) reconvey title to the two bridges to the Burlington-Bristol Bridge Company; (2) retransfer the stock of that company to the respective sellers thereof; (3) repay the bondholders $400,000 plus the net revenues from the bridges from the date of their acquisition; and (4) return to the Bridge Company, to be held subject to the order of the court, the $550,000 which was in the Bridge Company's treasury at the time the bridge commission acquired it. The Bridge Company and the members of the bridge-selling syndicate who received the purchase money for the stock of the Burlington-Bristol Bridge Company from the bridge commission were directed to repay the bondholders all moneys received from them, and "each shall disgorge and be required to repay such part of the purchase price as each received." The bondholders were given (1) the right to be subrogated to the rights of mortgagees and other lienors of the Bridge Company as of October 22, 1948, to the extent that such encumbrancers were paid off with the bondholders' moneys, and (2) a lien on the revenues of the bridges until the bonds were paid off, subject to the State's right of condemnation. A judgment was entered on December 29, 1950, incorporating the terms of the decision, and requiring each individually named defendant to pay a specific sum of money. That judgment provided in part as follows:

" 3. The members of the bridge sellers' syndicate (hereinafter referred to as the ' judgment debtors ') shall repay the sum of $3,050,347.00 which they received as the purchase price for their stock in the Burlington-Bristol Bridge Company, and judgments in favor of the Commission are directed as follows:

| | |
|---|---|
| Against Richard C. Nongard | $343,164.03 |
| Against Tuthill Ketcham | 343,164.03 |
| Against Rowland H. Murray | $ 76,258.68 * * *." |

Five things should be noted about this judgment of the lower court of New Jersey: (1) the total of the liabilities of the individually named judgment debtors was $3,050,347; (2) the firm of Ketcham & Nongard, as a partnership, was not named as one of the judgment debtors; (3) the total liability of the three partners of that firm mentioned by name (i.e., Ketcham, Nongard and Murray) was only $762,586.74, and not $3,050,347; (4) the specific liability of each of those partners named in the judgment was not equal: Ketcham and Nongard individually, were adjudged liable for $343,164.03 each, but Murray was adjudged liable for only $76,258.68; and (5) there was no provision as to joint and several liability. That the omission of the partnership of Ketcham & Nongard, as such, was not merely oversight is indicated by the fact that in another part of that same judgment the receivers were given a lien upon such of the bridge revenue bonds as were owned by Ketcham, Nongard and Murray " individually and as partners trading as Ketcham & Nongard."

An appeal was taken from that judgment by certain of the defendants to the Supreme Court of New Jersey. A judgment was entered upon the decision of that latter court on March 14, 1952. It differed from the judgment of the Superior Court in this important respect: instead of directing the reconveyance of the two bridges back to the Bridge Company, the return of the stock of that company to its sellers and the repayment of the bondholders by the Bridge Company, the judgment entered upon the decision of the Supreme Court confirmed title to the two bridges in the bridge commission. It then ordered the sellers of the Bridge Company to pay to the bridge commission all profits received from the transaction, and it decreed that all participants in the bond syndicate with the exception of the partnership firm of Ketcham & Nongard were holders in due course of the bridge revenue bonds, and as such " entitled to enforce the Bonds held by them to the extent of their interest therein and according to the terms thereof."

Respondents thereafter commenced this action in New York upon the New Jersey Supreme Court judgment. The New York Supreme Court denied respondents' motion for summary judgment but the Appellate Division reversed and granted that motion. The judgment entered upon the order of the Appellate

Division herein included the partnership of Ketcham & Nongard, as such, among those liable for the gross profits of $3,050,347 resulting from the sale to the bridge commission. In justification for such inclusion, the Appellate Division said: "Lastly, the defendants say that there was no basis for entering a judgment here against Ketcham and Nongard, a copartnership. The judgment in New Jersey defined the selling syndicate to include such a partnership. The selling syndicate was directed to repay the $3,050,347. This would appear to warrant a judgment against the partnership. All partners were sued and served individually as well.

"There appears to be no valid reason why a judgment should not be entered here as demanded in the complaint." (286 App. Div. 220, 231.) That partnership was an active party in the litigation in New Jersey and it may be that it could have been adjudged jointly liable with the members of the selling syndicate for $3,050,347. Neither court of that State, however, imposed such liability. The judgments of both courts in that State carefully specified not only *who* but for *how much* each named judgment debtor was liable. In addition, the judgment entered upon the decision of the Supreme Court of New Jersey specified that certain of the individual defendants were *jointly and severally liable* for the full amount of gross profits, while the remaining individual defendants were severally liable only for specific sums. This language which emphasizes the absence of any intention to adjudge the partnership firm of Ketcham & Nongard liable for the total amount of profit, is as follows: "The obligation to repay this sum [i.e., $3,050,347] is both *joint* and *several* as to Robert K. Bell, Theodore R. Hanff, Tuthill Ketcham, Richard C. Nongard and Clifford R. Powell, *but shall be several only as against the remaining sellers* in the amounts they each receive specifically: * * *." (Emphasis supplied.) (See 8 N. J. 501.) It is significant that in adjudging the liabilities of the three partners of Ketcham & Nongard mentioned in this part of the judgment two — Nongard and Ketcham as individuals — were adjudged *jointly and severally* liable for the entire $3,050,347, whereas the third partner — Murray — was adjudged liable *severally only* and for but $76,258.68. The partnership of Ketcham & Nongard, however, was not included in the enumeration of parties defendant

adjudged to be either jointly and severally liable or to be severally liable only. Thus, whatever the New Jersey courts may have been warranted in doing in this respect, as far as the partnership was concerned, they did not do it, and we cannot enlarge the New Jersey judgment, but must take it as we find it. A reading of the opinion in *Nongard* v. *Burlington Co. Bridge Comm.* (229 F. 2d 622) confirms this. (See pages 624, 626–627 of that opinion.)

The New Jersey judgment entered upon the Supreme Court decision decreed that all but one of the participants in the bond syndicate — including the Chemical Bank & Trust Company as well as B. J. Van Ingen & Co., Inc. — were holders in due course of the bridge revenue bonds and were entitled to enforce them as such. The sole exclusion was the partnership firm of Ketcham & Nongard, as to which the New Jersey judgment decreed that the bonds held by it were null and void '' except to the extent that the Chemical Bank has an interest therein as pledgee.'' If and in the event that the Chemical Bank & Trust Company exercised its rights as the pledgee of the bridge revenue bonds owned by the partnership firm of Ketcham & Nongard, '' so that the Bridge Commission either pays or remains obligated to pay principal or interest thereon the Bridge Commission shall be subrogated to all the rights of the Chemical Bank against Ketcham and Nongard arising out of the note dated October 27, 1948 of the bond syndicate which the Bonds were pledged to secure.'' The firm of Ketcham & Nongard owned $1,240,000 of the bridge revenue bonds, and was obligated to the extent of $1,131,715.66 on the note of October 27, 1948. By its check dated December 1, 1948, the partnership firm of Ketcham & Nongard had paid the sum of $350,000 in reduction of this liability. Between April 3, 1952, and February 15, 1954, the Burlington County Bridge Commission paid off the entire balance of $781,715.66 remaining due as Ketcham & Nongard's liability on the note of October 27, 1948, together with interest in the sum of $104,676.87, a total of $886,392.53.

In the second cause of action in the plaintiff's amended complaint in the Supreme Court of New York, the plaintiffs demanded monetary damages against the partnership of Ketcham & Nongard based upon those payments made to the

Chemical Bank & Trust Company by the Burlington County Bridge Commission. From the language of the New Jersey judgment which carefully specified the dollar liability of each of the three partners mentioned, as well as from the language of the New Jersey Supreme Court, however, it is obvious that it was never intended to impose upon this partnership the liability for $3,050,347 in addition to the liability for $886,392.53 claimed as recited above. Accordingly, it was error on the part of the court below to have directed the inclusion of the firm of Ketcham & Nongard among those liable for the gross profits of $3,050,347. The only liability of that partnership, under the New Jersey judgment, was to the bridge commission for such sums as that commission might pay to the Chemical Bank & Trust Company as pledgee of those bonds owned by Ketcham & Nongard which had been pledged with the bank by that partnership to secure its obligations under the note dated October 27, 1948. Those sums were set forth in the plaintiffs' amended complaint in the New York action, and are contained in the judgment entered upon the order of the Appellate Division.

It was suggested that certain liability imposed upon the defendant partnership was beyond the jurisdiction of the New Jersey court, and hence that the judgment of that court was not entitled to be enforced in New York. In *Reynolds* v. *Stockton* (140 U. S. 254), however, the Supreme Court stated that '' The requirements of that section [i.e., U. S. Const., art. IV, § 1] are fulfilled when a judgment rendered in a court of one State, which has jurisdiction of the subject matter and of the person, and which is *substantially responsive* to the issues presented by the pleadings, or is rendered under such circumstances that it is apparent that the defeated party was in fact heard on the matter determined, is recognized and enforced in the courts of another State.'' (140 U. S. 264; emphasis supplied.) In the present case no one argues that either the defendants or the subject matter — i.e., the cause of action for equitable relief based upon fraudulent conduct in the acquisition and sale of the bridges — were not before the New Jersey courts. The relief finally awarded was, in the judgment of the New Jersey court, the only equitable relief possible in this case. As the court said in *Nongard* v. *Burlington Co. Bridge Comm.*

(*supra*): "The New Jersey Supreme Court fashioned a comprehensive remedy to correct the wrong inherent in the entire scheme and did not undertake to deal with it piecemeal." The test established in the *Stockton* case (*supra*) was therefore met. Furthermore, many years after the *Stockton* case, in *Milliken* v. *Meyer* (311 U. S. 457), the Supreme Court decreed that where the court of a sister State had jurisdiction of the parties and the subject matter as it did in the present case, "the full faith and credit clause of the Constitution precludes any inquiry into the merits of the cause of action, the logic or consistency of the decision, or the validity of the legal principles on which the judgment is based." (311 U. S. 462.)

It is not necessary to go into the reasoning of the New Jersey court, the logic or consistency of its reasoning, or the legal principles upon which its decision was based. Thus, even if there were legal error committed when the partnership of Ketcham & Nongard was required to pay to the bridge commission any moneys which that commission might pay to the bank with which the bonds owned by the partnership had been pledged, that is not a matter subject to review in this State. It was open to the New Jersey Court to decide as it did under the equitable cause of action.

The original complaint in the New Jersey action recited the facts substantially as found by the courts of that State. The specific relief sought by that complaint was rescission of the entire transaction and the dissolution of the bridge commission. Of those transactions the New Jersey Supreme Court wrote that "One cannot read the record in the instant case fairly without being forced to the conclusion that the members of the selling syndicate through the medium of their political influence or professional prestige knowingly and intentionally for their private profit and without regard to their obligations as citizens induced the chosen freeholders and the bridge commissioners to violate their public trust by blindly agreeing to the syndicate's proposal." (8 N. J. 479.) Accordingly, the New Jersey court concluded that the transactions initiated by the defendants-appellants herein might not be permitted to stand. Appellants do not question that conclusion. Their primary argument is that in decreeing the specific relief to be afforded under the circumstances of this case the New Jersey court exceeded its

jurisdiction by awarding a *form* of relief different from that prayed for in the complaint.

It is important to note that the premise underlying this argument is the constitutional requirement of due process of law. In *Standard Oil Co.* v. *Missouri* (224 U. S. 270) the United States Supreme Court considered a similar argument and concluded that it had no merit, writing that "In civil suits the pleadings should no doubt contain a prayer for judgment so as to show that the judicial power of the court is invoked. The rules of practice also may well require that the plaintiff should indicate what remedy he seeks. But the Prayer does not constitute a part of the notice guaranteed by the Constitution. The facts stated fix the limit of the relief that can be granted. While the judgment must not go beyond that to which the plaintiff was entitled on proof of the allegations made, yet the court may grant other and different relief than that for which he prayed." (224 U. S. 285.)

In *Milliken* v. *Meyer* (311 U. S. 457, *supra*), the Supreme Court of the United States reversed a decision of the Supreme Court of Colorado which had in turn reversed a judgment of the court of Wyoming upon the ground that the Wyoming judgment was void because of an inconsistency between the findings and the decree. That was held to be a violation of the .full faith and credit clause of the Federal Constitution, which "precludes any inquiry into the merits of the cause of action, the logic or consistency of the decision, or the validity of the legal principles on which the judgment is based." (311 U. S. 462.)

The judgment here sued upon in New York is a judgment entered upon the decision of the Supreme Court of New Jersey. Appellants do not contest the general equitable jurisdiction of that court, nor do they contest that it had in personam jurisdiction over themselves. We shall not repeat here the findings of misconduct made by the New Jersey court, but those findings were unquestionably adequate to warrant a rescission, and this the appellants do not contest. The Supreme Court of New Jersey could, if the factual allegations were established, decree such relief as the case warranted. The factual allegations constitute the notice required by the Federal Constitution, and the appellants have not shown that any other type of notice is

required in New Jersey. Those factual allegations presented and defined the issues which the New Jersey court had jurisdiction to decide; and any inconsistency which might exist — and we think that there was none — between the factual issues as decided and the relief granted by the decree is not a matter for review in the courts of a sister State.

Appellants have also argued that the plaintiffs were not entitled to " money damages " because of an alleged " waiver " of any claim to such damages. It appears, however, that the only " waiver " of damages took place when the plaintiffs' counsel stated that they would not pursue the cause of action for damages set forth in the amended complaint in the New Jersey action. He was not referring to such incidental relief which the court might award as might require the defendants to repay to the bridge commission moneys to which the court might find that the defendants were not entitled. But that is exactly what the court did in fact do: it required the defendants to give up the profits that they had realized by their illegal conduct. The court was not required by the due process clause of the Federal Constitution to allow to the Ketcham and Nongard syndicate moneys or expenses which they had invested in the enterprise from which the bridge commission derived no benefit. Referring to this matter, the Supreme Court of New Jersey decided " This waiver was relied upon by the defendants in determining what witnesses to call in their defense and accordingly is binding on us as well as on the court below and prevents any assessment of damages based on the amended complaint against the selling syndicate. This waiver does not preclude us, however, from requiring the members of the selling syndicate over whom the court acquired jurisdiction to disgorge the profits which they received from this illegal transaction. Where rescission is prayed for and is warranted by the facts, but cannot be decreed because of the intervening equities of innocent third parties such as the bondholders here, under general principles of equity the court may require the wrongdoers to account for their profits so that as nearly as may be the parties will be protected and equity done  *   *   *." (8 N. J. 499.) It is clear, therefore, that not only were the factual issues before the New Jersey courts upon which the award of money " damages " incidental to the general equitable relief afforded

might be granted, but it is just as clear that those " damages " were merely the monetary profits which the defendants had reaped from their illicit manipulation and which, therefore, they were not entitled to retain.

The judgment appealed from should be modified by reversing so much thereof as adjudged the partnership of Ketcham & Nongard as such liable for $3,050,347, less certain deductions and payments and plus interest, totaling $3,283,024.46, and, as modified, affirmed, with costs.

DESMOND, FROESSEL, VAN VOORHIS and BURKE, JJ., concur with CONWAY, Ch. J.; DYE, J., taking no part.

FULD, J., dissents, in part, and votes to affirm in the following memorandum: Since it is my opinion, as it was that of the unanimous Appellate Division (286 App. Div. 220, 231), that the New Jersey judgment for some $3,000,000 runs against the partnership of Ketcham & Nongard, I am for affirmance of the judgment entered below.

Judgment of Appellate Division modified in accordance with the opinion herein and, as so modified, affirmed, with costs.