**REPUBLIC OF IRAQ, Plaintiff,**

v.

**FIRST NATIONAL CITY BANK, as Administrator of the Goods, Chattels, and Credits of His Majesty King Faisal II Ibn Ghazi Ibn Faisal I of Iraq, Deceased, Defendant.**

United States District Court
S. D. New York.
April 15, 1965.

Fennelly, Douglas, Eagan, Nager & Voorhees, New York City, for plaintiff. Leo C. Fennelly, Edward P. F. Eagan, New York City, of counsel.

Lord, Day & Lord, New York City, for defendant. Woodson D. Scott, New York City, of counsel.

McLEAN, District Judge.

The brief complaint in this action alleges that defendant on October 9, 1958, was appointed by the Surrogate's Court, New York County, administrator of the goods, chattels and credits of the late King Faisal II of Iraq, who died on July 14, 1958, that plaintiff "succeeded" King Faisal II, and that the assets in the possession of defendant as administrator "are the property of the plaintiff." Plaintiff seeks recovery of these assets.

Although the complaint fails to allege the basis of this court's jurisdiction, it appears that inasmuch as this is an action involving more than $10,000 by a foreign state against a trust company having its principal office in New York, this court has diversity jurisdiction under 28 U.S.C. § 1332.

In addition to a general denial, defendant has interposed various defenses. I permitted defendant to amend its answer at the opening of the trial to include an additional defense of the three-year New York statute of limitations.

I find the facts, many of which are undisputed, to be as follows:

Until his death on July 14, 1958, King Faisal II was the sovereign of Iraq. He was a resident of, and domiciled in, Iraq.

On various dates in 1957, he caused to be transferred to an account in his name in Irving Trust Company, New York, various sums aggregating $55,925. Also in 1957, he purchased, through Guaranty Trust Company of New York, for $60,000, 4,008 shares of Canada General Fund Ltd., an investment trust. These shares were held by Irving Trust Company in a custody account in the name of King Faisal II.

On October 8, 1958, the Surrogate's Court issued letters of administration on the estate of King Faisal II to defendant, which was then known as City Bank Farmer's Trust Company.[1]

In October 1958, the Consul General of the Republic of Iraq in New York notified defendant and Irving Trust Company that the Government of the Republic of Iraq, by virtue of Iraqi Decree No. 23 (set forth in full hereinafter), had confiscated the property of the previous Royal Family of Iraq, including that of King Faisal II. The Consul General requested that the ownership of "all accounts and other forms of mobile property" held by the respective banks for the account of any member of the Royal Family be transferred to the Republic of Iraq. Neither bank complied with this request.

In December 1958, defendant received from Irving Trust Company the property which Irving Trust Company had held for the account of King Faisal II, consisting of cash and the 4,008 shares of Canada General Fund Ltd. Thereafter defendant sold the 4,008 shares, thereby reducing all the assets to cash, totaling $112,944.61.

After the present action was begun in this court on March 9, 1962, defendant applied to the Surrogate's Court for an order consenting to the transfer of this action to that court for trial. Plaintiff appeared specially in the Surrogate's Court to oppose the application. The Surrogate granted his consent by order dated July 2, 1962. Defendant thereupon moved in this court for an order of transfer. Judge Bonsal denied the motion by order and opinion dated August 14, 1962 (207 F.Supp. 588 (S.D.N.Y. 1962)) on the ground that the sovereign Republic of Iraq could not be compelled against its will to submit its claim for determination to a tribunal not of its own choosing.

On April 23, 1964, the Surrogate's Court entered an intermediate decree on the final accounting of defendant as administrator. Citation in this proceeding had been served upon plaintiff, but plaintiff failed to appear or participate in it. This intermediate decree determined that Al Malika Genevieve Al Iraq (also known as Genevieve Arnault), was duly married to King Faisal II on June 22, 1957, and was his lawful surviving spouse, that Prince Zeid Ibn Hussein, the great-uncle of King Faisal II, was his nearest living male heir, and that pursuant to a certain stipulation of settlement, the net estate of King Faisal II should be distributed, two-thirds to Al Malika Genevieve Al Iraq, and one-third to Prince Zeid.

On December 14, 1964, the Surrogate's Court entered its final decree in the accounting proceeding. It charged defendant as administrator with $134,950.65 in the first instance, and credited it with the payment of administrative expenses and various miscellaneous items aggregating $18,249.08, leaving a balance on hand of $116,701.57. The decree settled and allowed the administrator's account and directed the administrator to pay various additional fees and commissions and to distribute the final net balance, amounting to $110,562.47 to Al Malika Genevieve Al Iraq and Prince Zeid Ibn Hussein, $73,708.31 to the former, and $36,854.16 to the latter. Defendant has not as yet made this distribution.

I turn now to the facts which give rise to plaintiff's claim. A revolution occurred in Iraq on July 14, 1958. King Faisal II was killed on that day, presumably by the revolutionaries, although no testimony was offered as to the circumstances of his death. Also on that day a proclamation was issued by the Commander in Chief of the Iraqi Armed Forces announcing the formation of the Republic of Iraq to be governed by a Presidential Council pending the election of a president. By a separate proclamation or "notification," also dated July 14, 1958, the names of the three members of the Presidential Council were announced.

---

[1]. Its name was later changed to First National City Trust Company, and in January 1963, it merged into First National City Bank.

By "Republican Ordinance No. 2," issued by the Presidential Council on July 14, 1958, the Prime Minister and the other ministers of the new government were appointed.

On August 2, 1958, the American Ambassador to Iraq sent a communication to the Minister of Foreign Affairs of Iraq who had been appointed on July 14, 1958, extending the good wishes of the United States Government to the Government of the Republic of Iraq. On the same day, the United States Department of State issued a press release stating that the United States had "extended recognition to the Government of the Republic of Iraq with the expression of its good wishes." The Office of the Legal Adviser of the Department of State, by letter dated July 22, 1964, has informed plaintiff's attorney that these documents constituted the formal evidence of the recognition of the Government of the Republic of Iraq by the United States Government. Defendant does not contend otherwise.

On July 19, 1958, the Presidential Council of Iraq issued Republican Ordinance No. 23 which is the basis of plaintiff's claim. It was signed not only by the three members of the Presidential Council, but also by the Prime Minister and a number of other ministers of the government. It was published in the Weekly Gazette of the Republic of Iraq in the issue dated July 30, 1958.[2]

The Gazette, apparently both before and after the revolution of July 14, 1958, was an official publication in which decrees of the Government of Iraq were customarily published. Before the revolution, it was known as the "Iraq Government Gazette." Its name was changed to "The Weekly Gazette of the Republic of Iraq" after July 14, 1958.

Decrees in this publication were customarily published both in Arabic and in English. When any discrepancy between the two versions occurs, however, the Arabic text is considered more authoritative.

Ordinance No. 23 is of sufficient importance to justify quotation in full. The English text of the Ordinance as published in the Gazette dated July 30, 1958, read as follows:

"REPUBLICAN ORDINANCE NO. 23 OF 1958, REGARDING THE CONFISCATION OF THE PROPERTY OF IRAQI Ex-DYNASTY AND ITS REGISTRATION IN THE MINISTRY OF FINANCE OF THE REPUBLIC OF IRAQ.

"It is well known that the Iraqi Ex-dynasty has exerted its influence in Iraq to gain illegal wealth since its inception, as from 23rd August 1921. Consequently, in accordance with the aims of the National Movement that have been achieved by the Iraqi Army supported by the people of Iraq with their consent on 14th July, 1958, for the realization of social justice and putting an end to the illegal exploitation, we issue the following ordinance:—

"Article 1.—By the dynasty, it is meant-King Faisal I, son of King Hussein, and his linage and his wife; King Ali son of King Hussein, his linage and his wife; Abdul Ilah and inheritance of his wife; and Prime Zeid son of King Hussein and his wife.

"Article 2.—All property of the Dynasty whether moveable or immoveable and any rights that have been registered under its name over immoveable property such as Miri lands and long term leases as well as its rights over moveable property, should be confiscated and registered under the Ministry of Finance of Iraq.

"Article 3.—Any real or juristic person in the Republic of Iraq and

---

2. A notation on the bottom of the ordinance states: "Published in the Waqayi' al-Iraqiya No. 1 of 23/7/58." This reference was not explained at the trial.

any Iraqi residing out of Iraq, managing, supervising, custodying or possessing any of the aforementioned property and debtor or borrower to any member of the Dynasty enumerated in Article 1, should present a declaration to the Government of Iraq concerning such connections.

"Article 4.—Any contract or procedure which is contradictory to this ordinance shall be considered null and void.

"Article 5.—Any person refuses to present the declaration as mentioned in Article 3 within three months from the enforcement of this ordinance or refuses to hand over the property belonging to any member of the Dynasty mentioned in Article I or try to smuggle or help to hide it, shall be sentenced for five years' imprisonment and a fine of not less than ID.500/— and/or either sentences.

"Article 6.—The Ministers of the State are charged with the execution of this Article.

"Made at Baghdad this 2nd day of Moharram Al-Haram, 1378 and the 19th day of July, 1958."

The English text contains certain inaccuracies, which are manifest upon a comparison with the Arabic text. Most important is the word "linage" which appears several times in Article 1. This should read "lineage." It means "descendants."

Furthermore, three words, i. e., "his lineage and" have been left out of the last line of Article 1, and in the next to the last line there is an obvious typographical error. The word "Prime" should be "Prince." The last phrase, therefore, should read, according to the Arabic text, "and Prince Zeid son of King Hussein and his lineage and his wife."

Although King Faisal II is not mentioned by name in the definition of "dynasty" in the Ordinance, he is included within the phrase "King Faisal I, son of King Hussein, and his lineage." King Faisal II was the grandson of King Faisal I, who was the first King of Iraq. King Faisal I was succeeded by his son King Ghazi, who was in turn succeeded by his son, King Faisal II. King Faisal I was the son of King Hussein who was king, not of Iraq, but of Hejaz (now part of Saudi Arabia). Prince Zeid was also a son of King Hussein.

With a view to supporting the recital in Ordinance No. 23 that "it is well known that the Iraqi Ex-dynasty has exerted its influence in Iraq to gain illegal wealth since its inception," plaintiff offered in evidence the report of an Iraqi Government Committee formed pursuant to a directive of the Minister of Finance, dated July 18, 1961, to inquire into the sources of wealth of the former Royal Family. I received this document (Plaintiff's Exhibit 17) over defendant's objection, subject to a motion to strike. Its contents are obviously hearsay, if offered to prove the truth of the statements contained in it, and I have grave doubt as to its admissibility under any exception to the hearsay rule. Moreover, it deals largely with the acquisition of land by the Royal Family, and although there are references to various bank accounts, it cannot be said with assurance that any part of the report relates directly to the particular property which is in issue here. I will not accept this document as proof that King Faisal II acquired the property here involved in a manner contrary to the laws of Iraq. I will, however, deny the motion to strike and receive the report merely as evidence that such a report was rendered or, in other words, that this government committee, some years after the enactment of Ordinance No. 23, stated that the Royal Family had acquired property illegally. The report is consistent with the recital in the Ordinance itself, and adds little or nothing to it. It is manifestly the fact that the Government of the Republic put forth the claim of illegal exploitation on the part of the Royal Family. In my opinion, the outcome of this case does not turn upon whether that claim is true. In any

event, plaintiff has not proved that it is true, as far as it relates to the particular property here concerned.[3]

Certain questions may be disposed of at the outset. As a matter of construction of Ordinance No. 23, I have no doubt that it purports to confiscate the property of King Faisal II. Furthermore, it purports to confiscate such property wherever situated. Although the Ordinance does not say this in so many words, this, in my opinion, is its fair meaning. Thus, it confiscates "all property" of the dynasty, regardless of its location, and it expressly imposes on Iraqis "residing out of Iraq," who have custody of any such property, the duty of reporting it to the government under pain of criminal penalties.

Finally, any ambiguity that might be thought to exist in the allegation of the complaint that plaintiff "succeeded" King Faisal II, has been dispelled by the evidence offered at the trial and the contentions asserted by plaintiff in argument. Plaintiff rests its case squarely on Ordinance No. 23. Its position is that by virtue of that Ordinance, plaintiff acquired title to the bank accounts and stock which were in the hands of Irving Trust Company when the Ordinance was enacted and which were subsequently delivered by Irving Trust Company to defendant as administrator. It remains to consider the legal validity of that position.

Plaintiff rests its claim primarily upon the "act of state" doctrine, the most recent pronouncement of which is found in Banco Nacional de Cuba v. Sabbatino, 376 U.S. 398, 84 S.Ct. 923, 11 L.Ed.2d 804 (1963). Earlier examples, relied upon by the Supreme Court in Sabbatino, are Underhill v. Hernandez, 168 U.S. 250, 18 S.Ct. 83, 42 L.Ed. 456 (1897), Oetjen v. Central Leather Co., 246 U.S. 297, 38 S.Ct. 309, 62 L.Ed. 726 (1918), Ricaud v. American Metal Co., 246 U.S. 304, 38 S.Ct. 312, 1 L.Ed.2d 733 (1918), and Shapleigh v. Mier, 299 U.S. 468, 57 S.Ct. 261, 81 L.Ed. 355 (1937).

The holding in Sabbatino was summed up in these words (376 U.S. at 428, 84 S.Ct. at 940):

"\* \* \* we decide only that the Judicial Branch will not examine the validity of a taking of property within its own territory by a foreign sovereign government, extant and recognized by this country at the time of suit, in the absence of a treaty or other unambiguous agreement regarding controlling legal principles, even if the complaint alleges that the taking violates customary international law." [4]

This holding does not dispose of the present case. Sabbatino, as well as the other "act of state" cases, applies only to a taking within the territory of the foreign sovereign. We are here concerned with an attempted taking of property outside that territory. This is clear as to the stock of Canada General Fund, Ltd. As to the bank accounts, the traditional view is that their situs is at the place of business of the debtor, or the place where the obligation was created, in this instance, New York. See Vladikavkazsky Ry. Co. v. N. Y. Trust Co., 263 N.Y. 369, 378–379, 189 N.E. 456, 460, 91 A.L.R. 1426 (1934); Pennington v. Fourth National Bank, 243 U.S. 269, 37 S.Ct. 282, 61 L.Ed. 713 (1917); United States v. Belmont, 301 U.S. 324, 334–335, 57 S.Ct. 758, 81 L.Ed. 1134 (1937) (concurring opinion). The question is whether this court will give extraterritorial validity to the confiscatory act.

Defendant points out that in a diversity case, this court in effect sits as a court of New York. This is true as a general proposition. Erie Railroad Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938); Klaxon Co.

---

3. Defendant's motion to strike Plaintiff's Exhibits 2 and 3 is denied.

4. The doctrine of Sabbatino has since been drastically modified by statute, at least with respect to proceedings commenced before January 1, 1966 involving confiscations occurring after January 1, 1959. 22 U.S.C. § 2370(e) (2). Since the confiscation involved here occurred before January 1, 1959, this statute has no application to the present case.

v. Stentor Electric Mfg. Co., 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941).

But it does not follow necessarily that the law to be applied is New York law. Sabbatino held, with respect to confiscations within the territory of the foreign state, that (376 U.S. at 425, 84 S.Ct. at 939):

" * * * an issue concerned with a basic choice regarding the competence and function of the Judiciary and the National Executive in ordering our relationships with other members of the international community must be treated exclusively as an aspect of federal law."

And even where the act of the foreign government purports to affect title to property in New York, New York policy must yield to an overriding federal executive policy, if one exists. United States v. Belmont, 301 U.S. 324, 57 S.Ct. 758, 81 L.Ed. 1134 (1937); United States v. Pink, 315 U.S. 203, 62 S.Ct. 552, 86 L. Ed. 796 (1942).

What is the policy of the executive department of the federal government with respect to the confiscation by the Republic of Iraq of the property of that country's former sovereign? The Department of State has not informed the court of any policy. On the contrary, it has adopted a "hands off" attitude. In a letter dated January 15, 1965 to defendant's attorney, the Deputy Legal Adviser of the Department of State said:

"While the recognition of and maintenance of diplomatic relations with a foreign government are political matters within the province of the executive department of the Federal Government, questions regarding the administration of estates and the determination of rights and interests in property in the United States ordinarily are matters for determination by the courts of competent jurisdiction. Accordingly, the Department considers that the legal effect of Ordinance No. 23 as it may pertain to title to property in the United States of King Faisal II is a

question for determination by the competent United States court."

Plaintiff points to United States v. Belmont, supra, and United States v. Pink, supra, each of which was an action brought by the United States as assignee of the Soviet Government under the "Litvinov Assignment" to recover property of a Russian corporation in the State of New York which had been confiscated by the Soviet Government prior to the recognition of that government by the United States. In each case the lower courts had dismissed the complaint on the ground that the confiscation offended New York policy and hence would not be enforced. In each case the Supreme Court reversed, holding that New York policy was immaterial, in view of the federal policy in favor of enforcement which was manifested by the recognition of the Soviet Government and the simultaneous acceptance by the United States of an assignment from the Soviet Government of its claim to the confiscated property here.

Despite the broad language of the opinions in these cases, I cannot escape the conclusion that the decision in each turned upon the existence of the assignment, which the Court in Belmont referred to as an "international compact" (301 U.S. at 327, 57 S.Ct. 759), and which in Pink the Court characterized as "interdependent" with the act of recognition (315 U.S. at 230, 62 S.Ct. at 565). See Comment, "Act of State" Immunity, 57 Yale L.J. 108, 115 (n. 37) (1947).

Recognition of a foreign government in and of itself, is not a sufficient manifestation of federal policy to require the court to give extraterritorial effect to its confiscatory decrees. Zwack v. Kraus Bros. & Co., 237 F.2d 255 (2d Cir. 1956). See Baglin v. Cusenier Co., 221 U.S. 580, 31 S.Ct. 669, 55 L.Ed. 863 (1911).

And the judgment of a court which refuses to give such effect to confiscatory action of a recognized government is a valid judgment which must be respected in the courts of the United

States. Ingenohl v. Walter E. Olsen & Co., 273 U.S. 541, 47 S.Ct. 451, 71 L.Ed. 762 (1927).

■ The "international compact" between the United States and the Soviet Government of Russia which was involved in Belmont and Pink seems to be unique. No other similar compact has been found in the cases. Where, as here, there is no such specific agreement, and where the Department of State has expressly left the question open for decision by the court, it cannot be said that there is any federal executive policy in favor of enforcing the title acquired by confiscation. See Bernstein v. N. V. Nederlandsche-Amerikaansche, 210 F.2d 375 (2d Cir. 1954).

■ Two theories have been suggested as a basis for the refusal of an American court to give extraterritorial effect to such a decree. One is the principle that one state will not enforce the penal laws of another. The other is the doctrine that a state will not enforce a cause of action based upon a foreign law which contravenes the public policy of the forum. See Restatement, Conflict of Laws (1934) §§ 611, 612; Proposed Restatement: The Foreign Relations Law of the United States (1962) § 46; Leflar, Extrastate Enforcement of Penal and Governmental Claims, 46 Harv.L.Rev. 193 (1932).

In a sense, both theories come down to the same thing, or at least the former can be regarded as a variant of the latter.

The penal law doctrine has its origin in a decision of Chief Justice Marshall in The Antelope, 10 Wheat. 66, 23 U.S. 66, 6 L.Ed. 268 (1825). It was again recognized in Huntington v. Attrill, 146 U.S. 657, 13 S.Ct. 224, 36 L.Ed. 1123 (1892). The Court there defined a penal law as a law the purpose of which is "to punish an offense against the public justice of the state," rather than to "afford a private remedy to a person injured by the wrongful act." (146 U.S. at 673–674, 13 S.Ct. at 230).

The New York Court of Appeals has laid down a substantially similar definition in Loucks v. Standard Oil Co., 224 N.Y. 99, 120 N.E. 198 (1918).

The Supreme Court has not abandoned this doctrine. Indeed, its existence was noted in Sabbatino (376 U.S. at 414, 84 S.Ct. 923), although the Court considered it to be inapplicable there, because it is a doctrine which comes into play only when extraterritorial enforcement of a penal law is attempted.

The doctrine has been explicitly recognized in England in the well-known case of Banco de Vizcaya v. Don Alfonso de Borbon y Austria, [1935] 1 K.B. 140. There a decree of the Spanish Republic confiscated the property of the late King Alfonso. The decree declared that the King was guilty of treason. The court held that the decree was ineffective to deprive the King of title to securities in England. It found the law to be penal in nature and hence unenforceable outside Spain.

There is a distinct parallel between the Iraqi ordinance in the present case and the Spanish decree in the English case. The Iraqi ordinance is also directed against a former sovereign. It also is prefaced by a recital of wrongdoing on his part, exploitation of the people, in this instance, rather than treason. In this case, as in the other, the property is seized for a public rather than a private purpose.

■ The English decision is, of course, not controlling upon me, but it is at least persuasive. No federal case has been cited which reaches a contrary result. I can perceive no reason why the English rule should not be followed here.

■ It is not necessary, however, to rest the decision of this case solely upon the penal law doctrine. The public policy approach has more frequently been adopted by American courts. Confiscation without payment is repugnant to our fundamental concept of justice. That was the basis of the court's refusal to give extraterritorial effect to a Hungarian

confiscation in Zwack v. Kraus Bros. & Co., supra. That decision is the closest federal precedent that has been discovered. If federal law is to govern under all circumstances, Zwack appears to represent the federal law in this circuit on the point.

Finally, it may still be appropriate to consider the public policy of New York. Sabbatino, Belmont and Pink may be regarded as holding only that state policy is irrelevant when a contrary federal executive policy is found to exist. As I have pointed out, there is no indication of any such federal executive policy here. If there is room to apply New York public policy, it seems clear that this action cannot succeed. The New York courts have consistently declined to enforce a cause of action based upon a foreign decree which purports to seize title, without payment of compensation, to property in New York.[5] Vladikavkazsky Ry. Co. v. N. Y. Trust Co., 263 N.Y. 369, 189 N.E. 456, 91 A.L.R. 1426 (1934); Plesch v. Banque Nationale de la Republique d' Haiti, 273 App.Div. 224, 77 N.Y.S.2d 43 (1st Dept. 1948), aff'd, 298 N.Y. 573, 81 N.E.2d 106 (1948).

■ I conclude, therefore, both as a matter of federal law and as a matter of New York law, that plaintiff is not entitled to recover the property which it seeks in this action. I reach this conclusion on the strength of the authorities heretofore cited, without regard to the nationality or residence of the heirs of King Faisal II. It is therefore unnecessary to take further testimony on that subject or to inquire into the disputed question of whether Al Malika Genevieve Al Iraq (also known as Genevieve Arnault), who the Surrogate held to be the wife of King Faisal II, was in fact his wife. It is also unnecessary to consider the questions raised by the defendant's defense of the New York statute of lim-

itations or its contention that plaintiff is bound by the decree of the New York Surrogate's Court.

Nor is it necessary to deal with defendant's contention that in fact the property here involved was not the property of King Faisal II on July 19, 1958, when Ordinance No. 23 was enacted, because under the Iraqi law of inheritance, title to it vested in his heirs immediately upon his death on July 14, 1958. Defendant's evidence of Iraqi law on this point was not entirely convincing, but I see no need to discuss it in detail, since we do not reach that question here. Assuming, contrary to defendant's argument, that the bank accounts and stock were in fact the property of King Faisal II on July 19, 1958, as the Republic of Iraq obviously considered them to be, plaintiff still may not recover them in this action, for the reasons which I have indicated.

Pursuant to Rule 52(a), this opinion constitutes the court's findings of fact and conclusions of law.

The motions upon which I reserved decision at the trial are disposed of as follows:

Plaintiff's motion to strike defendant's first affirmative defense, pleading lack of jurisdiction in this court over the subject matter of this action, is granted. In order to clear the record, plaintiff's motion to strike defendant's other defenses is denied. As previously stated, it is unnecessary to pass upon the sufficiency of these defenses, except so much of the fourth defense as alleges that any claim asserted by plaintiff by right of confiscation to the property of King Faisal II in New York is contrary to public policy and unenforceable. I hold that defense sufficient for the reasons set forth in this opinion.

I grant defendant's motion made at the close of the entire case to dismiss the

5. In Anderson v. N. V. Transandine Hendelmaatschappij, 289 N.Y. 9, 43 N.E.2d 502 (1942), the New York court held that a decree of the Netherlands Government in Exile, promulgated in May 1940, taking title to the property of its na-

tionals to hold as trustee for them until the end of World War II, did not offend New York policy. The distinction between that decree and the confiscations involved in the other cases cited is obvious.

complaint on the ground that plaintiff has not proved a claim upon which relief can be granted. The Clerk is directed to enter judgment in favor of defendant dismissing the complaint.

So ordered.