DAVID J. CONNOLLY et al., as Receivers to Collect a Judgment in Favor of BURLINGTON COUNTY BRIDGE COMMISSION, et al., Appellants, *v.* ROBERT K. BELL et al., Defendants, and THEODORE R. HANFF et al., Respondents.

First Department, June 7, 1955.

*A. Donald MacKinnon* of counsel (*Rebecca M. Cutler* and *Michael F. Orr* with him on the brief; *Milbank, Tweed, Hope & Hadley,* attorneys), for appellants.

*Frederick W. R. Pride* of counsel (*Donald J. Nugent* and *Robert M. Lane* with him on the brief; *Dwight, Royall, Harris, Koegel & Caskey,* attorneys), for respondents.

CALLAHAN, J. Plaintiffs moved for summary judgment in the Supreme Court, New York County, in an action on a judgment previously rendered in the State of New Jersey. The primary issue is whether the New Jersey judgment is entitled to full faith and credit in New York. (U. S. Const., art. IV, § 1; U. S. Code, tit. 28, § 1738.)

The New Jersey action was instituted in December, 1948, by the Governor and Attorney-General of the State of New Jersey to set aside the acquisition of two toll bridges across the Delaware River by the Burlington County Bridge Commission in October, 1948. The facts in the action are set forth in the opinion of the Supreme Court of New Jersey (see *Driscoll* v. *Burlington-Bristol Bridge Co.,* 8 N. J. 433). Summarized, the claim was that certain defendants, pursuant to a fraudulent scheme, formed a syndicate to acquire the stock of two corporations, which owned the bridges, and then sold the stock at a large profit to a county bridge commission created by the Burlington County Freeholders at the instigation of the defendants. The funds with which the commission paid for the stock were obtained by issuance of the commission's bridge revenue bonds. These were to be purchased by a syndicate, of which some of the sellers of the stock were also members. Under Federal and State statutes, pursuant to which the bridges had been erected,

provision had been made for condemnation or purchase by the State at a price fixed according to statutory formula based on a percentage over cost. It was estimated that the price to be paid in condemnation would have been $5,000,000, whereas the sum paid by the bridge commission was $12,400,000. One of the consequences of the sale to the commission was the termination of the State's right to acquire the bridges by condemnation.

The original complaint in the New Jersey action originally sought rescission of the entire transaction, the appointment of a receiver, and such other relief as the court might deem just and equitable.

Subsequently, the complaint was amended to add, among other things, a cause of action for money damages against individual members of the selling syndicate. The damages asserted were the $7,400,000 represented by the difference between the cost of condemnation and the sum paid. Certain of the defendants filed counterclaims and cross claims for the purpose of having the bonds declared valid and to compel the commission to perform its obligations with respect thereto.

During the course of trial in the New Jersey action, the plaintiffs therein elected to proceed solely on the theory of rescission and waived their cause of action against members of the selling syndicate for the $7,400,000 damages. The case then proceeded as if the pleadings were in their original form.

The trial court found that the bridge commissioners were derelict in the performance of their public duties. It found that contracts, except the contract for sale of the bonds, were against public policy and void. The trial court also found that the various holders of bonds had either participated in or had knowledge of the illegality of the transaction so as to prevent their being holders in due course. It directed entry of judgment in rescission for surrender of the bridge to the corporations formerly owning them and return of the purchase price. (See *Driscoll* v. *Burlington-Bristol Bridge Co.*, 10 N. J. Super. 545.)

While the Supreme Court of New Jersey on appeal concurred in the findings of the trial court as to fraud in the acquisition of the bridges by the bridge commission, it determined against a full rescission as appropriate relief in the circumstances. This was (pp. 497–498): " because of the fact that it would substantially prejudice the rights of the holders in due course of the bonds of the bridge commission. These bonds as issued are a lien on the revenues of the two bridges. So long as these bridges remain in the hands of the bridge commission they and their revenues are tax-exempt, but if the bridges were restored

to private ownership it would be beyond the power of the court to prevent property taxes and income taxes from diverting funds in substantial amounts which would otherwise be payable to the bondholders. It is obvious, therefore, that a present rescission on any terms which we could impose would be inequitable to the bondholders, depriving them of protection to which they are entitled as holders in due course ''.

The Supreme Court of New Jersey further stated that the most equitable and practical relief was to leave title to the bridges in the bridge commission, subject to the supervision of the court. It noted that the plaintiffs during trial had elected to proceed on the theory of rescission alone and had waived any claim against the defendants for $7,400,000 in damages. The court then stated (pp. 499–500): '' This waiver was relied upon by the defendants in determining what witnesses to call in their defense and accordingly is binding on us as well as on the court below and prevents any assessment of damages based on the amended complaint against the selling syndicate. This waiver does not preclude us, however, from requiring the members of the selling syndicate over whom the court acquired jurisdiction to disgorge the profits which they received from this illegal transaction. Where rescission is prayed for and is warranted by the facts, but cannot be decreed because of the intervening equities of innocent third parties such as the bondholders here, under general principles of equity the court may require the wrongdoers to account for their profits so that as nearly as may be the parties will be protected and equity done [citing cases]. Moreover, where as here the wrongdoers have conspired together to reap a profit out of a fraudulent transaction they are jointly and severally liable and it is not necessary even that they all be before the court in order to grant complete relief [citing cases]. The members of the selling syndicate must make restitution of that which they have received, for otherwise they will be unjustly enriched by their fraud at the expense of the public. They and their nominees are therefore liable to repay the $3,050,347 gross profit which they received for their stock as the result of this transaction and they are not entitled to any credit for the expenses incurred in effectuating the fraudulent scheme, for none of those expenses can rightly be said to have been of benefit to the bridge commission or the public it represents.''

To effectuate its conclusions the Supreme Court of New Jersey directed that the judgment appealed from be modified and the case remanded to the Superior Court for entry of judgment, *inter alia,* that the acquisition of the bridges was illegal and

voided, but only to the extent provided in its decision. The judgment on remand was to provide that (p. 501): "all participants in the bond syndicate, with the exception of Ketcham and Nongard, are holders in due course. As such holders, they and those claiming under them are entitled to enforce the bonds held by them to the extent of their interest therein and according to the terms thereof. Ketcham and Nongard as active participants in the illegal transaction are not holders in due course and the bonds held by them are null and void, except to the extent that the Chemical Bank has an interest therein as pledgee. In the event and to the extent that the Chemical Bank exercises its rights in the bonds as pledgee so that either principal or interest are paid thereon by the bridge commission, the bridge commission shall be subrogated to all the rights of the Chemical Bank against Ketcham and Nongard arising out of the note of the bond syndicate which the bonds were pledged to secure." The bridge commission was to retain title to the bridges. To the extent that the members of the selling syndicate, or their nominees, had an interest therein, the entire transaction was rescinded in all respects. The judgment directed the syndicate members to repay the sum of $3,050,347 to the bridge commission. This represented the gross profit received from the sale of their stock in the Burlington-Bristol Bridge Company. The obligation to repay this sum was declared to be joint and several as to the defendants Bell, Hanff, Ketcham, Nongard and Powell, but several only as to the remaining sellers in amounts representing sums actually received as specified by the court.

The members of the selling syndicate were given credit for the sum of $600,000 specified in the decision, but no provision was made to allow the syndicate members anything for the actual value of their bonds or the sums advanced in the purchase of the bridges or loaned to the commission.

The judgment in suit before this court is the judgment entered by the Superior Court on remittitur from the Supreme Court of New Jersey. It modified the judgment entered on the original trial, and directed judgment in various amounts, including the sum of $3,050,347, against each of the several members of the selling syndicate who are the defendants herein. A New York judgment in favor of the plaintiffs and against the defendants in the principal sum of $3,050,347, with interest and costs, is sought in the present action.

The complaint herein alleges, and the answer admits, that the New Jersey action was brought in a court of general jurisdiction, that there was jurisdiction of the person based on personal

service upon the present defendants followed by appearance and representation by counsel, and that the judgment annexed to the complaint had been entered. The complaint also contains a second cause of action against the defendants Ketcham and Nongard to enforce a claim of the Burlington County Bridge Commission as subrogee to the rights of Chemical Bank and Trust Company of New York arising out of sums received as pledgee of certain bonds as provided in the New Jersey judgment.

The defendants' answer contains six defenses as follows: (1) That the New Jersey judgment was lacking in due process, because it was not responsive to issues tendered by the pleadings and proceedings in the action in that State, and, therefore, the defendants were deprived of a proper hearing; (2) That it lacked due process, because it decreed excessive damages, or a penalty, departing from the claim for rescission; (3) That it was lacking in due process, because it decreed that the liability of certain members of the selling syndicate was joint as well as several; (4) That it was contrary to the Fourteenth Amendment and confiscatory in decreeing that bonds in the hands of the defendants Ketcham and Nongard were null and void; (5) That it was contrary to the public policy of New York and nonenforcible as a penalty, and that the full faith and credit clause of the United States Constitution did not require enforcement; and (6) That it was a taking of private property for public use without just compensation.

We fail to find any triable issue of fact. The issues raised solely involve questions of law as to the extent to which New York must give full faith and credit to the New Jersey judgment.

We will first discuss the claim asserted by the defendants under several of their defenses that the judgment in the New Jersey action extended beyond the scope of the issues as stated in the pleadings and beyond the demands of the plaintiffs made upon the trial, and that, therefore, the judgment sought to be enforced herein was rendered without jurisdiction so that its recognition would offend due process. The defendants are asserting in this regard that the plaintiffs in the New Jersey suit agreed upon the trial to waive all money damages, so that the defendants refrained from offering proof that might have reduced such damages. Thus, according to the defendants in this case, the Supreme Court of New Jersey assessed damages which had been waived, and as to the liability for which the defendants had not been heard.

The record in the New Jersey action shows that the plaintiffs withdrew their cause of action for money damages. They did, however, press the cause of action for rescission. The fact that a cause of action for money damages had been pleaded, but was dropped, would not limit in any respect the power of the trial court, or an appellate court on review, to mould the remedy that might be granted in rescission under the law of the State. The general rule, and undoubtedly that of New York, is that when equity has obtained jurisdiction of the parties and the subject matter, it will adapt its relief to the exigencies of the case (*Valentine* v. *Richardt*, 126 N. Y. 272; *International Photo Rec. Mach.* v. *Microstat Corp.*, 269 App. Div. 485; *Post* v. *Browne*, 279 App. Div. 922, affd. 304 N. Y. 610).

Assuming that the prayer for relief after amendment omitted reference to money damages, that would not limit the power of the court to grant relief appropriate to the remaining cause of action based on the facts pleaded therein. The due process guaranteed by the Fourteenth Amendment is satisfied when the judgment does not go beyond that to which the plaintiff was entitled on the facts pleaded and proved (*Standard Oil Co.* v. *Missouri*, 224 U. S. 270).

The action, as it remained after the cause of action for money damages was dropped, was in rescission, and the appellate court awarded a judgment that it deemed appropriate in a rescission suit. The New Jersey judgment is not subject at this time to collateral attack for mistake of law (*Fauntleroy* v. *Lum*, 210 U. S. 230, 236–237). It is not for this court to inquire whether there was an erroneous construction of the law of the foreign State in respect to damages, or whether the remedy was appropriate, especially where, as here, there was some reasonable relation between the wrong asserted and the remedy afforded. In a case where there was a claim of irreconcilable contradiction between the findings of the court and the decree rendered, but where the court was competent to adjudicate in that it had jurisdiction, the Supreme Court of the United States said: "In such cases, the full faith and credit clause of the Constitution precludes any inquiry into the merits of the cause of action, the logic or consistency of the decision, or the validity of the legal principles on which the judgment was based" (*Milliken* v. *Meyer*, 311 U. S. 457, 462).

The rule invoked by the defendants to defeat recognition of the present judgment is that enunciated in *Reynolds* v. *Stockton* (140 U. S. 254, 271) to the effect that: "when a complaint tenders one cause of action, and in that suit service on, or

appearance of, the defendant is made, a subsequent judgment therein, rendered in the absence of the defendant, upon another and different cause of action than that stated in the complaint, is without binding force within the courts of the same State; and, of course, notwithstanding the constitutional provision heretofore quoted, has no better standing in the courts of another State.''

However, the facts in the *Stockton* case (*supra*) will show the distinction between that case and the present. There a judgment had been awarded in New York purportedly pursuant to a reservation in an earlier judgment. The first judgment was obtained in an action quasi in rem to satisfy certain claims out of securities on deposit with the Superintendent of Insurance valued at about $100,000. The new judgment decreed recovery of over $1,000,000 against a successor receiver. The original receiver had been ancillary receiver in New York at an earlier date, but had accounted and was discharged long before the new judgment was entered. The new judgment directed bringing into court and distributing money or assets not within the jurisdiction of the court at the earlier trial, and not included in the earlier receivership. Thus, the new claim was entirely foreign to the original in rem proceedings. The case involved no trial or participation in the new proceedings by the defendants, and, of course, no amendment to the pleadings of which they had notice. Even assuming that the absence of the defendant was not the decisive factor in the *Stockton* case, the holding does not control the present situation. Its limits were pointed out in *Oliphant* v. *Burns* (146 N. Y. 218, 238). The *Stockton* decision was overruled in certain respects, not material here, in *Milwaukee Co.* v. *White Co.* (296 U. S. 268, 278). We do not question, however, that at this time it remains authority for the proposition that a judgment obtained in the absence of a defendant for another and a different cause from that stated in the complaint has not such standing as to entitle it to full faith and credit.

The decision rendered by the New Jersey Court in the present case appears to have been within the issues submitted to it. Accordingly, it is not subject to collateral attack in respect to a claim that the award was outside the court's jurisdiction in the action.

We may next dispose of the defendants' claim that the judgment is to be denied recognition because it is one for a penalty as that term is understood in private international law.

The basic cause of action here rested on the common law of tort, and not on a claim created by statute as a method of enforcing a State's governmental interests. The plaintiffs, though State officers, were not suing to collect a penal sum fixed by a statute of a foreign State in the nature of a fine. (See *Wisconsin v. Pelican Ins. Co.*, 127 U. S. 265.) They were seeking to enforce a proprietary rather than a governmental right. Whether a judgment for an obligation created by a penal law in the international sense must be given full faith and credit, even though a suit for the penalty before reduction to judgment could not be maintained outside the State, is an open question (*Milwaukee Co. v. White Co., supra,* p. 279). But the original claim here was not for a penalty. The only basis for any assertion that it was such is that the New Jersey action was brought by State officials on its behalf, and that the plaintiffs were awarded sums of money not measured by financial loss but based on the defendants' financial gain.

The rule that courts of one State will not enforce the penal laws of another would not be applicable to such a judgment, even if it could be correctly stated that the judgment awarded damages which were punitive or exemplary. The present judgment was given in a civil action in which rescission of a transfer of property was sought. The judgment eventually given did not grant rescission as prayed for, because such relief was not practicable, but required payment over to the plaintiffs of profits fraudulently obtained by the defendants in the transaction. Though the sum to be paid may not have afforded compensation in the sense that it was measured by the plaintiffs' loss, the damages awarded were given as the best available remedy to help make the plaintiffs whole, and were not intended solely as smart money to avoid future offenses or vindicate public justice. The damages were compensatory in a broad sense.

But damages might even be punitive in nature in that they are apportioned to the defendants' guilt. In such instance they would not be deemed penal in the sense that such term is used in determining their enforcibility under private international law (*Loucks v. Standard Oil Co.*, 224 N. Y. 99).

The courts are not compelled to limit damages to compensation in that they must always give a sum representing the plaintiffs' loss. Damages may, for instance, be measured by the value of property ordered to be returned, if return is not complied with. Our own courts have in exceptional cases held that a tort-feasor will not be permitted to make a gain through his wrongful act, and have assessed damages measured by the

benefit to the wrongdoer (*De Camp* v. *Bullard,* 159 N. Y. 450; *Bunke* v. *New York Tel. Co.,* 110 App. Div. 241, affd. 188 N. Y. 600; 1 Clark on New York Law of Damages, § 350). No case has been called to our attention where a money judgment in a court of competent jurisdiction rendered in a civil action based on tortious conduct was refused full faith and credit merely on the ground that it involved damages not measured by the plaintiff's loss, but the defendant's gain.

In *Huntington* v. *Attrill* (146 U. S. 657) certain tests were laid down in order to determine whether a judgment was penal. There it was said (p. 668): " The test whether a law is penal, in the strict and primary sense, is whether the wrong sought to be redressed is a wrong to the public, or a wrong to the individual, according to the familiar classification of Blackstone: ' Wrongs are divisible into two sorts or species: *private wrongs and public wrongs.* The former are an infringement or privation of the private or civil rights belonging to individuals, considered as individuals; and are thereupon frequently termed *civil injuries:* the latter are a breach and violation of public rights and duties, which affect the whole community, considered as a community; and are distinguished by the harsher appellation of *crimes* and *misdemeanors.*' " And at pages 673–674, the court added: " The question whether a statute of one State, which in some aspects may be called penal, is a penal law in the international sense, so that it cannot be enforced in the courts of another State, depends upon the question whether its purpose is to punish an offence against the public justice of the State, or to afford a private remedy to a person injured by the wrongful act."

In applying the foregoing tests to the present case we must keep in mind that here the State was in effect a private suitor seeking a private remedy to vindicate its proprietary interests. The mere fact that a sovereign State was the litigant is not controlling. In effect, it has received an award of damages found to approximate the gains of one who had deprived the State of its property rights. Such a recovery is not to be refused full faith and credit on the theory that the judgment was penal.

The remaining claims of the defendants largely based on alleged lack of due process may be readily disposed of.

First, the defendants say that the New Jersey court had no power to declare the liability of the defendants who were syndicate members to be joint as well as several. They contend that no claim of joint liability had been asserted against these defend-

ants. The facts alleged in the complaint in the New Jersey action were that the defendants who were syndicate members had conspired as co-tort-feasors to perpetrate a fraud on the State of New Jersey. The liability of such co-tort-feasors might be held to be joint as well as several.

A further claim is made of lack of due process in that the New Jersey judgment is confiscatory in decreeing that the bonds of the defendants Ketcham and Nongard were null and void. The action being in equity based on fraud, the court could well have avoided any of the securities acquired by the wrongdoers.

The defendants further assert that there was a taking of private property for public purposes without just compensation. The answer to this is that there was no taking of property. A sum found by the trial court to represent the gross profits was ordered paid as money damages. That the fixation of damages gave no credit for the cost of the bonds, nor for money advanced or loaned by some of the wrongdoers to the Bridge Commission in the course of carrying out the fraud, would not make the judgment one for " acquiring property " as by a condemnor.

Damages were fixed for a wrong committed, and whether the measure of damages was correct or incorrect, equitable or inequitable, or unduly burdensome because improperly based on gross rather than on net profits is not the concern of this court, which may not consider the correctness of the judgment in these respects, but is required to give it full faith and credit where there was jurisdiction to render it and no fraud in obtaining it.

Lastly, the defendants say that there was no basis for entering a judgment here against Ketcham and Nongard, a copartnership. The judgment in New Jersey defined the selling syndicate to include such a partnership. The selling syndicate was directed to repay the $3,050,347. This would appear to warrant a judgment against the partnership. All partners were sued and served individually as well.

There appears to be no valid reason why a judgment should not be entered here as demanded in the complaint.

The order appealed from should be reversed, with $20 costs and disbursements, and the plaintiffs' motion for summary judgment granted.

Cohn, J. P., Breitel, Botein and Rabin, JJ., concur.

Order unanimously reversed, with $20 costs and disbursements to the appellants, the motion granted and judgment is directed to be entered in favor of the plaintiffs and against the defendants-respondents for the relief demanded in the complaint.