The REPUBLIC OF the PHILIPPINES
and National Power Corporation,
Plaintiff,

v.

WESTINGHOUSE ELECTRIC CORPO-
RATION, Westinghouse International
Projects Company and Burns & Roe En-
terprises, Inc., Defendants.

Civ. No. 88–5150.

United States District Court,
D. New Jersey.

May 5, 1993.

Mark Augenblick, David J. Cynamon, James B. Hamlin, J. Patrick Hickey, Era A. Raphaelson, Shaw, Pittman, Potts & Trowbridge, Washington, DC and Paul A. Rowe, and Alan S. Naar, Greenbaum, Rowe, Smith, Ravin & Davis, Woodbridge, NJ, for plaintiffs (Law Offices of Paul S. Reichler, and Paul C. Warnke, Washington, DC, of counsel).

David Boies, Richard Clary, Cravath, Swaine & Moore, New York City, Raymond M. Tierney, Jr., Robert A. Burke, Shanley & Fisher, Morristown, NJ, and Jonathan D. Schiller and Randall L. Speck, Donovan, Leisure, Rogovin & Schiller, Washington, DC, for defendant Westinghouse.

Glenn A. Mitchell, David U. Fierst, Stein, Mitchell & Mezines, Washington, DC, and George W.C. McCarter, McCarter & English, Newark, NJ, for defendant Burns & Roe.

## OPINION

DEBEVOISE, District Judge.

The Republic of the Philippines (the "Republic") and the National Power Corporation ("NPC") instituted this action against Westinghouse Electric Corporation and Westinghouse International Projects Company (collectively, "Westinghouse") and Burns & Roe Enterprises, Inc. ("Burns & Roe"), asserting fifteen tort and contract claims. Thirteen of these claims were referred to arbitration, and the remaining two claims are the subject of a trial now underway. In these two claims, the Republic alleges that Defendants bribed President Ferdinand E. Marcos in order to obtain particular contracts, and thereby interfered or conspired to interfere with the fiduciary duties that President Marcos owed to the Philippine people. The Republic now seeks a ruling permitting it to present its claims for punitive damages to the jury. This court has jurisdiction because the citizenship of Plaintiffs is diverse from that of Defendants, and the amount in controversy exceeds $50,000. 28 U.S.C. § 1332.

## I. STATEMENT OF FACTS AND PROCEDURAL HISTORY

This case arises out of the construction of the 600–megawatt Philippine Nuclear Power Plant ("PNPP") in Bagac, Bataan during a ten year period commencing in 1976. The Republic has alleged that Westinghouse won the contract to build PNPP not by submitting a superior contract proposal, but rather by bribery and deceit. The facts and procedural history of this action are presented in the seven opinions already published, and so I will review them only briefly here. *Philippines v. Westinghouse Electric Corp.*, 782 F.Supp. 972 (D.N.J.1992); *Philippines v. Westinghouse Electric Corp.*, 139 F.R.D. 50 (D.N.J.), *stay denied*, 949 F.2d 653 (3d Cir. 1991); *Philippines v. Westinghouse Electric Corp.*, 774 F.Supp. 1438 (D.N.J.1991); *Philippines v. Westinghouse Electric Corp.*, 132 F.R.D. 384 (D.N.J.1990), *mandamus denied*, 951 F.2d 1414 (3d Cir.1991); *Philippines v. Westinghouse Electric Corp.*, 714 F.Supp. 1362 (D.N.J.1989).

Plaintiffs originally brought a fifteen-count complaint, thirteen counts of which were stayed pending arbitration. 714 F.Supp. 1362. Most of the counts were asserted on behalf of NPC only, since NPC was the party that actually dealt with Burns & Roe and Westinghouse. These NPC counts include

breach of contract, fraud, negligence, civil conspiracy, RICO violations, antitrust violations, and various pendent state claims, all of which have been before Geneva arbitrators for several years, as well as certain minor claims against Burns & Roe that have been stayed. Only two counts were asserted on behalf of the Philippines, tortious interference and conspiracy to interfere with the fiduciary duties of President Marcos. It is these two counts that are now on trial in this court.

## II. DISCUSSION

The Republic wishes to present to the jury a claim under Philippine law for punitive damages. Defendants urge that, in a federal district court sitting in diversity jurisdiction in New Jersey, no punitive damages are available.

### A. Choice of Law

The threshold question is whether to apply the Philippine laws of punitive sanctions or the law of another jurisdiction. As a practical matter, this question has already been answered. The parties themselves have agreed that Philippine substantive law must apply, and I found in an earlier opinion that all of the significant events and circumstances of this case tie it to the Philippines. 774 F.Supp. at 1449–1451.

■ The next question is which law to use in evaluating whether to present the Republic's punitive claims to the jury. It is well-settled that a federal court sitting in diversity jurisdiction applies the choice-of-law rules of the state in which the court sits. *Klaxon Co. v. Stentor Electric Mfg. Co.*, 313 U.S. 487, 496, 61 S.Ct. 1020, 1021, 85 L.Ed. 1477 (1941). This rule extends not just to traditional choice of law questions, but also to cases like the present, in which a court must decide whether to enforce foreign punitive laws. *Trans Container Services (Basel) A.G. v. Security Forwarders, Inc.*, 752 F.2d 483 (9th Cir.1985) (court should apply local choice-of-law rules in action where private party sought exemplary damages under English law); *Smyth Sales, Inc. v. Petroleum Heat & Power Co.*, 128 F.2d 697, 702 (3d Cir.1942) (court should apply local choice-of-

law rules in action where private parties sought exemplary damages under law of another state). Accordingly, New Jersey law will govern the question of whether the Republic can recover punitive damages under Philippine law in a New Jersey federal court.

### B. Enforcement of a Judgment versus Trial of a Claim

Much of the pertinent New Jersey case-law involves actions in which a plaintiff has sought to enforce laws or judgments of another state. There are two potential distinctions between this case-law and the present case: first, the present case involves the law of a foreign country rather than that of another state; and second, the present case involves the trial of a claim rather than the enforcement of a judgment.

■ The law of another state carries more authority than that of another country because the laws of other states are protected, at least in part, by the Full Faith and Credit Clause of Article IV, Section I of the U.S. Constitution. *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 105 S.Ct. 2965, 86 L.Ed.2d 628 (1985); *Allstate Insurance Co. v. Hague*, 449 U.S. 302, 101 S.Ct. 633, 66 L.Ed.2d 521 (1981); *Milwaukee County v. M.E. White Co.*, 296 U.S. 268, 275, 56 S.Ct. 229, 233, 80 L.Ed. 220 (1935); *Home Ins. Co. v. Dick*, 281 U.S. 397, 50 S.Ct. 338, 74 L.Ed. 926 (1930). In addition, as discussed below, concerns of comity and policy may weigh more heavily in favor of enforcing the laws of other states than those of other countries.

■ Judgments also carry special authority. Judgments of other states are particularly authoritative, because these judgments wield the full power of the Full Faith and Credit Clause. By comparison, acts of state legislatures depend for their enforcement on a combination of state policy, comity, the Full Faith and Credit Clause, and the Due Process Clause of the Fourteenth Amendment. *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 105 S.Ct. 2965, 86 L.Ed.2d 628; *Allstate Insurance Co. v. Hague*, 449 U.S. 302, 101 S.Ct. 633; *Milwaukee County v. M.E. White Co.*, 296 U.S. at 275, 56 S.Ct. at 233.

■ In New Jersey, judgments may carry special authority even when the judgments are those of other countries. For example, the New Jersey Supreme Court has stated that "[w]e recognize that the reduction of the penalty to a civil judgment is a significant change in its status. *That metamorphosis diminishes the penal nature of the claim* and enhances the enforceability of the judgment under the Full Faith and Credit Clause." *Philadelphia v. Austin,* 86 N.J. 55, 61, 429 A.2d 568 (1981) (emphasis added). Thus, a New Jersey court might enforce a penal judgment from a foreign country even if the court would decline to assess the penalty at trial. *Id.; Connolly v. Bell,* 286 A.D. 220, 141 N.Y.S.2d 753 (1955), *modified,* 309 N.Y. 581, 132 N.E.2d 852 (1956).

■ Neither of these factors can enhance the authority of the punitive sanctions sought by the Republic here. The sanctions do not arise under the law of another state, nor have they been reduced to judgment. Accordingly, the Republic's claims must stand on their own, without the support of the Full Faith and Credit Clause and without the authority of a judgment that masks their penal nature.[1]

### C. The Penal Nature of the Philippine Law

Given that the claims at trial are to be tried under Philippine law, the next question is whether a New Jersey court would recognize the Republic's claims for punitive damages. New Jersey's Supreme Court, like other courts to consider the issue, has

adopted Chief Justice John Marshall's observation in *The Antelope,* 23 U.S. 66, 123, 6 L.Ed. 268 (1825), that "[t]he Courts of no country execute the penal laws of another."[2] *See Philadelphia v. Austin,* 86 N.J. at 58, 429 A.2d 568.

■ The New Jersey Supreme Court has circumscribed Chief Justice Marshall's succinct but sweeping observation to conform with a number of constitutional and local considerations, including the Full Faith and Credit Clause, due process, public policy, and comity. In other words, even though a New Jersey court need not enforce the penal laws of another sovereign, the court must nonetheless must give full faith and credit to the judgments of another state, recognize foreign laws in accordance with due process, deny recognition to foreign laws when they offend public policy, and give comity to the laws of another country. As a consequence, New Jersey and other states' courts have read *The Antelope* quite narrowly. *See* Peter B. Kutner, *Judicial Identification of "Penal Laws" in the Conflict of Laws,* 31 OKLA. L.REV. 590 (1978).[3]

The present case, involving the law of a foreign country, is governed by comity rather than by the Full Faith and Credit Clause. However, it is useful to examine New Jersey's cases under the Full Faith and Credit Clause because these reveal New Jersey's understanding of the meaning of the word "penal." In addition, comity and Full Faith and Credit analysis may often give the same

---

1. The parties have cited several cases in which the plaintiff sought to enforce a sister state judgment that contained arguably punitive damages. *See Huntington v. Attrill,* 146 U.S. 657, 13 S.Ct. 224, 36 L.Ed. 1123 (1892); *Miller v. Kingsley,* 194 Neb. 123, 230 N.W.2d 472 (1975); *Holbein v. Rigot,* 245 So.2d 57 (Fla.1971); *Connolly v. Bell,* 286 A.D. 220, 141 N.Y.S.2d 753. As discussed in the text, these cases are readily distinguishable from the case at hand.

Some of the other cases cited by the parties are also distinguishable on similar grounds. For example, the Republic notes that the United States Supreme Court has allowed foreign governments to collect treble damages under U.S. antitrust laws. *Pfizer, Inc. v. India,* 434 U.S. 308, 98 S.Ct. 584, 54 L.Ed.2d 563 (1978). Whether the United States will try cases under its own laws in its own courts is an entirely different issue from

whether New Jersey courts will try cases under Philippine law.

2. Although Chief Justice Marshall's observation refers specifically to the penal laws of other *countries,* courts have applied it to the penal laws of other *states* as well. *E.g. Huntington v. Attrill,* 146 U.S. 657, 13 S.Ct. 224, 36 L.Ed. 1123 (Maryland need not enforce a New York penal judgment).

3. For example, most courts will enforce civil judgments for punitive damages in litigation by private parties, even when the damages are measured by the fault of the defendant rather than by the injury to the plaintiff. *See, e.g. Loucks v. Standard Oil Co.,* 224 N.Y. 99, 120 N.E. 198 (1918).

result. *Philadelphia v. Austin,* 86 N.J. 55, 429 A.2d 568.

As a general matter, in determining whether to enforce a punitive law, New Jersey courts always look to the substance of the foreign law rather than to its form. *See, e.g., Philadelphia v. Austin,* 86 N.J. 55, 429 A.2d 568; *New York v. Sacco,* 242 N.J.Super. 699, 577 A.2d 1333 (Super.Ct.Law Div.1990). "The test is not by what name the statute is called by the legislature or the courts of the state in which it was passed, but whether it appears, to the tribunal which is called upon to enforce it, to be, in its essential character and effect, a punishment of an offense against the public, or a grant of a civil right to a private person." *Huntington v. Attrill,* 146 U.S. 657, 682, 13 S.Ct. 224, 233, 36 L.Ed. 1123 (1892).

New Jersey courts have often avoided the strictures of *The Antelope* by finding non-penal purposes in laws that appear to impose penalties. For example, in *New York v. Coe Mfg. Co.,* 112 N.J.L. 536, 172 A. 198, *cert. denied,* 293 U.S. 576, 55 S.Ct. 89, 79 L.Ed. 674 (1934), New York asked New Jersey to enforce a judgment against a corporation for unpaid franchise taxes and fines. The New Jersey Supreme Court found that the taxes were not penal because they were simply a fee for the privilege of doing business in New York. The fines were more problematic, but the Court ultimately concluded that the defendant's agreement to pay franchise taxes resembled a contract, and the fines resembled liquidated damages. The court held that laws at issue were not penal laws which, "strictly and properly, are those imposing punishment for an offense committed against the State." 112 N.J.L., at 538, 172 A. 198. As authority for its holding, the court relied primarily on *Huntington v. Attrill* and *The Antelope.*

In *Pennhurst State School v. Estate of Goodhartz,* 42 N.J. 266, 200 A.2d 112 (1964), the Supreme Court again refused to find that a sister-state's law was penal. In this case, Pennsylvania brought an original action to compel the defendants to pay the fees of the relatives who were receiving services at a state facility. The Supreme Court held that the purpose of the Pennsylvania statute at issue was to enforce familial obligations, not to impose penalties. In addition, the court noted that the law did not violate the public policies of New Jersey, since New Jersey had similar laws.

The Appellate Division faced a similar issue and reached a similar result in *Terenzio v. Nelson,* 107 N.J.Super. 223, 258 A.2d 20 (Super.Ct.App.Div.1969). In *Terenzio,* however, the court had to overcome New York's own characterization of the laws as "penal in nature." The court found that the laws were penal only in the sense that they should be strictly construed, but that otherwise the laws were analogous to those in *Pennhurst.* Thus, New York's characterization of the laws as penal did not bind New Jersey—"[a] rose by any other name is still a rose." *Id.* at 228, 258 A.2d 20.

New Jersey continues to apply a narrow definition of "penal" in its decisions involving foreign laws and judgments. In *New York v. Sacco,* 242 N.J.Super. 699, 577 A.2d 1333, the court found that New York's sanctions for contempt were not penal because they were designed to coerce, not to punish. The court relied on *In re Daniels,* 118 N.J. 51, 570 A.2d 416, *cert. denied,* 498 U.S. 951, 111 S.Ct. 371, 112 L.Ed.2d 333 (1990), in which the New Jersey Supreme Court distinguished between civil contempt, designed to coerce future action, and criminal contempt, designed to punish past misdeeds. In *Philadelphia v. Smith,* 82 N.J. 429, 413 A.2d 952 (1980), the court found that fines associated with foreign tax judgments were not assessed as punishment, but rather to compensate the state for its expenses in collecting the fines. Again, the court looked to *Huntington v. Attrill:*

> The privilege of refusing to enforce the sister State judgment, if it exists at all, is a narrow one. The Supreme Court has stated that a cause of action is not penal in the sense here used unless "its purpose is to punish an offense against the public justice of the State" rather than "to afford a private remedy to a person injured by the wrongful act." *Huntington v. Attrill,* 146 U.S. 657, 673–4, 13 S.Ct. 224, 230, 36 L.Ed. 1123 (1892).

*Smith,* 82 N.J. at 433, 413 A.2d 952 (parallel cites omitted).

As noted above, the New Jersey Supreme Court has often relied on *Huntington v. Attrill* when wrestling with the penal nature of a foreign law. In *Huntington v. Attrill,* the United States Supreme Court examined the penal nature of a New York statute that assessed liability against a director/shareholder for the debts of a corporation in cases where the director/shareholder had falsely certified that the corporation's stock was fully paid-in. The Court found that the statute was compensatory, not penal. In so doing, it defined penal as follows:

> The test whether a law is penal, in the strict and primary sense, is whether the wrong sought to be redressed is a wrong to the public or a wrong to the individual, according to the familiar classification of Blackstone: "Wrongs are divisible into two sorts or species: private wrongs and public wrongs. The former are an infringement or deprivation of the private or civil rights belonging to individuals, considered as individuals, and are thereupon frequently termed 'civil injuries;' the latter are a breach and violation of public rights and duties, which affect the whole community, considered as a community, and are distinguished by the harsher appellation of 'crimes and misdemeanors.' "

146 U.S. at 668–69, 13 S.Ct. at 228.

One key feature of this definition is that it emphasizes the role of the state as both plaintiff and as beneficiary. The Court noted that exemplary damages were not usually considered penal when they accrued to indi-

viduals, but only when "the prosecution was in the name of the state, and the whole penalty, when recovered, would accrue to the state.'[4] 146 U.S. at 671, 13 S.Ct. at 229. (Of course, a claim does not become penal simply because a government seeks to enforce it. *New York v. Coe Mfg. Co.,* 172 A. 198; *Milwaukee County,* 296 U.S. 268, 56 S.Ct. 229; *Philadelphia v. Austin,* 86 N.J. 55, 429 A.2d 568.)

Reducing this body of case law to its essentials, I find that the New Jersey Supreme Court would consider the following factors important in determining whether to enforce punitive sanctions imposed by foreign law: whether the purpose of the law is to punish an infringement of individual rights or a breach of public duties; whether the fines imposed would accrue to a public authority or to an individual; whether the fines are calculated to compensate the plaintiff for harm suffered or to punish the defendant for past acts, deter future acts, and provide retribution; whether the foreign law merits special consideration on policy grounds, such as a foreign tax judgment, a foreign judgment distributing the burden of supporting indigents in state institutions, or a foreign judgment imposing fines for contempt; and, as discussed in the next section, whether comity dictates enforcement.

■ Applying these principles to the present case, I find that the punitive sanctions sought by the Republic are penal in nature and, unless comity should dictate otherwise, unenforceable in a New Jersey court.[5] To

---

**4.** Many courts and authorities have emphasized that a penal law is one in which the state brings the action and recovers the damages. *See, e.g. Playtex Family Products, Inc. v. St. Paul Surplus Lines Ins. Co.,* 564 A.2d 681, 686 n. 4 (Del.Super.Ct.1989), *opinion entered,* 1990 WL 35,299 (Del.Super.Ct. Mar. 27, 1990) (a judgment is not penal if its purpose is to "assess a penalty for the benefit of the person aggrieved, rather than the state at large"); Robert A. Leflar, *Extrastate Enforcement of Penal and Governmental Claims,* 46 HARV.L.REV 197, 204 (1932) (a law is penal if it "prescribes punishment at the instance of the state or its representative for violations of the criminal law as such"); *Loucks v. Standard Oil Co.,* 120 N.E. 198, 199, 120 N.E. 198 (1918) (a law is penal if it "awards a penalty to the state, or to a public officer in its behalf, or to a member of the public suing in the interest of the whole community to redress a public wrong");

*Iraq v. First National City Bank,* 241 F.Supp. 567 (S.D.N.Y.), *aff'd,* 353 F.2d 47 (2d Cir.1965), *cert. denied,* 382 U.S. 1027, 86 S.Ct. 648, 15 L.Ed.2d 540 (1966) (a foreign decree was penal because, among other things, it ordered that property be confiscated for the benefit of the public).

   Accordingly, cases cited by the Republic in which an individual is allowed to recover punitive damages are distinguishable from the case at hand. *See, e.g. Rivera v. Anaya,* 726 F.2d 564 (9th Cir.1984); *Peoples Bank and Trust Co. v. Piper Aircraft Corp.,* 598 F.Supp. 377 (S.D.Fla. 1984); *Trans Container Services v. Security Forwarders,* 752 F.2d 483 (9th Cir.1985).

**5.** As was noted at the outset of this opinion, NPC also seeks damages on behalf of the Republic for alleged wrongs such as breach of contract, fraud, negligence, civil conspiracy, RICO violations, an-

begin with, the Republic has expressly alleged that Defendants interfered with, and conspired to interfere with, President Marcos' fiduciary duty to the Philippine people *as a whole.* This duty is imposed not just by the civil law, but also by the Philippine constitution and by criminal statutes. *Philippines v. Westinghouse Electric Corp.*, 774 F.Supp. 1438. In other words, the Republic alleges "a breach and violation of public rights and duties, which affect the whole community, considered as a community." *Huntington v. Attrill*, 146 U.S. at 668, 13 S.Ct. at 228.

A second consideration is the nature of the sanctions that the Republic seeks to impose. In cases such as this, Philippine courts impose punitive sanctions not to compensate plaintiffs, but rather to deter "wanton acts," "by way of example or correction for the public good." (Sangco Aff. of Nov. 20, 1991, at ¶¶ 3, 5.) In judging what acts to deter and the appropriate level of deterrence, a Philippine court would focus on a number of aggravating circumstances, including the defendant's "wickedness," i.e. whether "the defendant acted in a wanton, fraudulent, reckless, oppressive or malevolent manner;" whether "the crime was committed in contempt of or with insult to, public authorities;" whether "the crime was committed in the palace of the chief executive;" and other factors. (*Id.* at ¶ 3 (citing Phil.Civ.Code art. 2230, Rev.Penal Code art. 14.).) However, "courts generally place the greatest weight upon two principal factors: (a) the degree of wickedness of the defendant's behavior;" and, to insure adequate deterrence, "(b) the defendant's financial standing." (*Id.* at ¶ 9.)

Thus, the sanctions that the Republic seeks to recover here are punitive in nature, even under New Jersey's narrow definition of that word. They are punitive in intent, and they seek to punish Defendants for prior misdeeds. *See Memphis Community School Dist. v. Stachura*, 477 U.S. 299, 306 n. 9, 106 S.Ct. 2537, 2542 n. 9, 91 L.Ed.2d 249 (1986) ("[t]he purpose of punitive damages is to punish the defendant for his willful or malicious conduct and to deter others from similar behavior"); *cf. New York v. Sacco*, 242 N.J.Super. 699, 577 A.2d 1333 (punitive sanctions punish defendants for prior unlawful acts). Moreover, the sanctions cannot possibly have any compensatory character, since the Republic will recover all of its compensatory damages through arbitration and through the recovery of any bribes awarded here.[6]

The remaining considerations also favor denying the Republic's request to allow punitive sanctions. For example, if the Republic were seeking punitive damages in favor of a particular wronged individual, then perhaps New Jersey courts would be more likely to recognize the Republic's punitive claims. But the Republic is not seeking these damages to recompense a particular individual— any money recovered in the instant trial will go into the public coffers. In addition, New Jersey does not recognize the Republic's cause of action, tortious interference with fiduciary duties, as one that merits a special exemption from the rule against applying the penal laws of another sovereign.

In conclusion, I find that I must look beyond the "civil" label that the Republic has attached to its claim for punitive damages. These damages are penal and unenforceable.

titrust violations and various pendent state claims. These claims are now before the arbitrators in Geneva, and this opinion is not intended to express any view about the appropriateness of punitive damages in the arbitration hearings.

6. In the present case, which is confined to allegations of bribery, the measure of damages is the amount of the bribes paid directly or indirectly to President Marcos. It might be argued that this measure of damages is itself punitive in nature, because it is not tied to actual losses suffered by any individual or entity. However, courts have traditionally found that a principal can recover bribes from an agent under the theory of constructive trust. The agent is presumed to act on behalf of the principal, and therefore any bribes collected by the agent are held in trust for the principal's benefit. *Jaclyn, Inc. v. Edison Bros. Stores, Inc.*, 170 N.J.Super. 334, 368–69, 406 A.2d 474 (Super.Ct.Law Div.1979). Accordingly, the recovery of the alleged bribes here is compensatory in the sense that the Republic had a lawful expectation that moneys paid to its agent, President Marcos, would be held for its benefit. As noted in the text, the NPC also stands to recover compensatory and perhaps punitive damages in the arbitration proceedings.

Their purpose is to deter violations of duties to the public as a whole, by collecting damages for the public treasury in order to punish past offenses and deter future offenders.

### D. Comity

The final question is whether New Jersey would enforce Philippine penal sanctions under principles of comity, even though these sanctions might otherwise be unenforceable.[7] New Jersey courts have shown their willingness to overlook the penal nature of foreign judgments several times, most notably in *Philadelphia v. Austin*, 86 N.J. 55, 429 A.2d 568. *See also Breeden v. N.J. Dep't of Corrections*, 258 N.J.Super. 252, 609 A.2d 483 (Super.Ct.App.Div.1992).

In *Austin*, the plaintiff sought to enforce a tax judgment that arguably had at least some penal provisions, defined as provisions that were intended to "redress a public wrong" and as "[p]unishment of a public offense." 86 N.J. at 60, 61, 429 A.2d 568. The court offered several rationales for enforcing the judgment: first, in the special case of tax laws, the Full Faith and Credit Clause required the enforcement of foreign civil judgments with penal features; second, the judgment could be considered compensatory, not penal; and third, even if the judgment was penal and outside the power of the Full Faith and Credit Clause, comity dictated its enforcement. *See also Breeden v. N.J. Dep't of Corrections*, 258 N.J.Super. 252, 609 A.2d 483 (invoking comity in honoring concurrent prison sentence imposed by California).

The *Austin* court looked to three factors in analyzing whether to give comity to the foreign judgment: "(1) the convenience of the litigants and witnesses, as well as the interests of justice (forum non conveniens); (2) the dissimilarity of remedies in the different jurisdictions; and (3) the existence of conflicts with the local public policy of the forum." 86 N.J. at 63, 429 A.2d 568 (discussing penal provisions in revenue laws).

The first of these elements is not germane here, because the Republic voluntarily selected New Jersey and Defendants have not been inconvenienced thereby. However, the second element is more of a concern. If the issue of punitive damages is sent to the jury, then the jury must evaluate Defendants' wickedness and select the appropriate sanction to deter future offenses.

In making these judgments, the jury must consider the aggravating circumstances outlined above, as well as all the other circumstances attendant to Defendants' acts. However, the jury must be careful not to apply their own sensibilities to the Philippine standards. These standards were written to achieve the proper result when applied by a fact-finder from the Philippines, not a jury from New Jersey. Thus, in order to assess the appropriate amount of punitive damages, a New Jersey jury must examine the material facts of this case from the perspective of the Philippine people. In other words, the jury must place the facts of this case in the context of the customs and culture of the Philippines, the circumstances and practices of conducting business there, and the suffering that President Marcos caused when he exploited his powers and abandoned his duties as president. Unless the jury can accomplish this, their award of punitive damages may bear little resemblance to the award that a Philippine fact-finder would have made on the same record.

Punitive damage awards can be problematic even under the best of circumstances. *Pacific Mut. Life Ins. Co. v. Haslip*, 499 U.S. 1, ——-——, 111 S.Ct. 1032, 1055–67, 113 L.Ed.2d 1, 35–50 (1991) (O'Connor, J., dis-

---

7. The Third Circuit has defined comity as follows:

Comity is a recognition which one nation extends within its own territory to the legislative, executive, or judicial acts of another. It is not a rule of law, but one of practice, convenience, and expediency. Although more than mere courtesy and accommodation, comity does not achieve the force of an imperative or obligation. Rather, it is a nation's expression of understanding which demonstrates due regard both to international duty and convenience and to the rights of persons protected by its own laws. Comity should be withheld only when its acceptance would be contrary or prejudicial to the interest of the nation called upon to give it effect.

*Somportex Corp. v. Philadelphia Chewing Gum Corp.*, 453 F.2d 435, 440 (3rd Cir.1971) *cert. denied*, 405 U.S. 1017, 92 S.Ct. 1294, 31 L.Ed.2d 479.

senting). Juries are often free to impose crippling liabilities with little guidance save their common sense or, unfortunately, their biases, prejudices, and whims. Here, the Republic is asking me to add yet another element of uncertainty—a jury unfamiliar with the cultural standards that they seek to apply—to a remedy already known for its capriciousness. I find that the result would be sufficiently unpredictable that a New Jersey court would hesitate to overlook the penal nature of the sanctions sought by the Republic.

The final consideration is whether comity would favor enforcement of Philippine penal laws in order to promote the public policies of New Jersey. As discussed above, New Jersey courts will sometimes overlook the penal nature of a foreign law if they can advance local concerns by enforcing the law. However, this is not such a case. To begin with, enforcing foreign penal laws violates general tenets of public policy, even were it not proscribed by the New Jersey Supreme Court. *See Iraq v. First National City Bank*, 241 F.Supp. 567 (S.D.N.Y.), *aff'd*, 353 F.2d 47 (2d Cir.1965), *cert. denied*, 382 U.S. 1027, 86 S.Ct. 648, 15 L.Ed.2d 540 (1966) (states do not enforce foreign penal laws as a matter of public policy). For example, the machinery of justice is expensive and unwieldy, and no state would gratuitously adopt "the added expense to taxpayers of conducting trials and enforcing sentences and judgments, coupled with possible overcrowding of dockets by unnecessarily imported suits." [8] Robert A. Leflar, *Extrastate Enforcement of Penal and Governmental Claims*, 46 HARV. L.REV. 197, 201 (1932).

The New Jersey Supreme Court was willing to sacrifice these policy concerns in *Austin* because New Jersey had a strong competing concern, the desire to enforce its own revenue laws in other states.[9] Indeed, New Jersey and Pennsylvania had a formal agreement that called for the reciprocal enforcement of tax laws, albeit not those at issue in *Austin.* 86 N.J. at 64–65, 429 A.2d 568. New Jersey and the Republic have no such agreement for the reciprocal enforcement of the claims at issue here, nor will New Jersey often want to pursue penal actions in Philippine courts against those who have bribed New Jersey public officials.

Moreover, New Jersey has little or no other public interests in this action. As I explained in an earlier opinion, this action "does not implicate New Jersey's interest in deterrence, which 'is ordinarily associated "with the sovereignty in which past misconduct took place and in which future misconduct may occur." ' " 714 F.Supp. at 1450 (citations omitted). New Jersey would seem to have no interest in exposing a domestic corporation (Burns & Roe) and a Pennsylvania corporation (Westinghouse) to crippling sanctions for acts that are not likely to be repeated in New Jersey.

The few other jurisdictions that have addressed similar questions have also been reluctant to enforce punitive sanctions imposed under foreign law, even when the sanctions were reduced to judgments. For example, in *Laminoirs–Trefileries–Cableries de Lens, S.A. v. Southwire Co.*, 484 F.Supp. 1063 (N.D.Ga.1980), the court declined to enforce a part of an arbitration award because the award imposed a punitive interest rate. The court found that 5% of the interest was punitive, and that assessing this punitive interest against the defendant would "violate [Georgia's] most basic notions of morality and justice." *Id.* at 1068.

---

8. In addition, enforcing foreign penal laws raises several public policy concerns that militate against enforcement because it infringes on the rights of foreign sovereigns. In the present case, the Republic would seem to have waived these policy concerns. For example, one sovereign may refuse to enforce the penal code of another out of respect for the other sovereign's right to determine for itself the meaning and application of its laws. In addition, a United States forum is often inconvenient for a foreign sovereign, because the sovereign must litigate in a distant land using a foreign language and unfamiliar legal machinery.

9. "Underlying the extrastate enforcement of judgments for unpaid taxes, interest and penalties is the recognition that taxes are the lifeblood of government, the vital force needed to sustain the public interest." 86 N.J. at 65, 429 A.2d 568.

The court also declined to enforce a foreign penal decree[10] in *Iraq v. First National City Bank*, 241 F.Supp. 567. The decree at issue, an Iraqi ordinance, directed that all of the properties of the assassinated Iraqi king be turned over to the Iraqi government. The court found the ordinance to be penal because it included a recital of the king's exploitation of the people, and because it seized the king's property for public rather than private use.[11] This case, like *Laminoirs*, is consistent with my refusal to allow punitive sanctions here. The Republic too seeks public recovery for a ruler's exploitation of his people.

In summary, I find that considerations of comity cannot rescue the Philippines' claims for punitive damages. Comity may be sufficient to induce the New Jersey courts to overlook the penal nature of tax laws, but it would not induce them to overlook the penal nature of the punitive claims at issue here.

## III. CONCLUSIONS

The Republic, if successful in its claims against Defendants, will be limited to compensatory damages. An appropriate order shall issue.

---

**10.** The court did not rest its holding solely on the penal nature of the Iraqi confiscation. The court noted that even if the law had no penal character, it would refuse to enforce the law as a matter of public policy. 241 F.Supp. at 574–75.

**11.** *Chase Manhattan Bank, N.A. v. Hoffman*, 665 F.Supp. 73 (D.Mass.1987), is also instructive. In *Chase*, the court enforced a Belgian judgment rendered as a civil award ancillary to a criminal trial. The court found that the damages were compensatory, not penal, because the Belgian court had assessed the damages (i) to redress a private injury, (ii) in the amount of the injury, and (iii) to be paid directly to the injured individual. By implication, the *Chase* court would have refused enforcement if, as here, the court had assessed the damages to redress a public injury, in an amount not determined solely by the injury, to be paid into the public coffers.